# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE APPRAISAL OF PANERA
BREAD COMPANY

)
)
)
)

C.A. No. 2017-0593-MTZ

## MEMORANDUM OPINION
Date Submitted: October 7, 2019
Date Decided: January 31, 2020

Samuel T. Hirzel, II, Elizabeth A. DeFelice, and Melissa N. Donimirski, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Steven M. Hecht, Michael T.G. Long, Jarett N. Sena, Natalie F. Dallavalle, Frank T.M. Catalina, Edoardo Murillo, and Jonathan M. Kass, LOWENSTEIN SANDLER LLP, New York, New York; *Attorneys for Petitioners.*


Paul J. Lockwood, Jennifer C. Voss, Jenness E. Parker, Alyssa S. O'Connell, Kaitlin E. Maloney, Daniel S. Atlas, Bonnie W. David, and Andrew D. Kinsey, SKADDEN ARPS SLATE MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Respondent.*

**Zurn, Vice Chancellor.**

In this appraisal action, I must determine the fair value of each share of the subject company on the closing date of its acquisition. I find that the process by which the company was sold bore several objective indicia of reliability, which were not undermined by flaws in that process. I therefore find that the deal price is persuasive evidence of fair value, and give no weight to other valuation metrics. I deduct some synergies, but find others were not adequately proven. I undergo that synergies analysis solely to fulfill my statutory mandate, rather than to effectuate any transfer of funds between the parties, because the company prepaid the entire deal price and has no recourse for a refund under the appraisal statute.

## I.  BACKGROUND[1]

This appraisal action generated an extensive record. During six days of trial, the parties introduced 1,336 exhibits and lodged seventeen depositions in evidence.[2]

---

[1] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. *See* Docket Item ("D.I.") 108. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit.

[2] *See* D.I. 103, Ex. 1. The subset of exhibits the parties relied on is set forth on the schedule of evidence. *See* D.I. 148, Ex. A; D.I. 151.

Five experts and six fact witnesses testified live. These are the Court's findings based on a preponderance of the evidence.

Respondent Panera Bread Company ("Panera" or the "Company") is a national bakery-cafe concept in the United States and Canada.[3] Panera is a corporation organized and existing under the laws of Delaware, with headquarters in St. Louis, Missouri.[4] Until July 18, 2017, Panera's stock was listed on the NASDAQ stock exchange under the symbol "PNRA."[5]

On that date, JAB Holdings B.V. purchased Panera for $315.00 per share.[6] That entity is a private limited liability company incorporated under the laws of the Netherlands that indirectly has a controlling interest in JAB Holding Company, LLC.[7] JAB Holding Company, LLC is a private limited liability company incorporated under the laws of Delaware and headquartered in Washington D.C. that indirectly has held a controlling interest in Panera since the acquisition.[8] JAB Holding Company S.à.r.l. has an ultimate controlling interest in JAB Holdings B.V.,

---

[3] PTO ¶¶ 48, 89.

[4] *Id.* ¶ 48.

[5] *Id.* ¶ 49.

[6] *Id.* ¶ 1.

[7] *Id.* ¶¶ 66–67.

[8] *Id.* ¶ 65.

JAB Holding Company, LLC and Panera.[9]  I refer to all of these entities collectively as "JAB."

In the wake of JAB's acquisition, certain dissenting Panera stockholders ("Petitioners" or "Dissenting Stockholders") are entitled to an appraisal of the fair value of their Company shares in accordance with their demands.[10]  Petitioners hold 785,108 shares of Panera's common stock.[11]  Petitioners include Short Hills Capital Partners, holding 35,800 shares of Panera common stock;[12]  Weiss Asset Management, including 2017 Arlington, LLC, holding 154,669 shares of Panera common stock;[13]  Canyon International LLC, holding 31,794 shares of Panera common stock;[14]  and Yellowstone Global LLC, holding 47,692 shares of Panera common stock.[15]  Each of the Petitioners demanded appraisal before the vote on the merger, held the appraisal shares through the merger date, and maintained their appraisal demand.

---

[9] *Id.* ¶ 68.

[10] *Id.* ¶ 20.

[11] *Id.* ¶ 22.

[12] *Id.* ¶ 26.

[13] *Id.* ¶ 32.

[14] *Id.* ¶ 37.

[15] *Id.* ¶ 42.

Relevant non-parties include Panera board members Domenic Colasacco, Fred K. Foulkes, Larry J. Franklin, Diane Hessan, Thomas E. Lynch, William W. Moreton, Ronald M. Shaich, Mark Stoever, and James D. White.[16]

Shaich founded Panera in 1981.[17] He served on the board from 1981 to December 2018 in various capacities, including Chairman, Co-Chairman, Executive Chairman, and Non-Executive Chairman.[18] Shaich served as Chief Executive Officer from 1984 to May 2010, when he stepped back from the Company to co-found an organization called "No Labels," which he hoped would reduce partisanship in American politics.[19] During this time, Shaich remained Panera's largest stockholder and Executive Chairman, and Moreton served as CEO.[20] In 2012, Moreton had a family issue and asked Shaich to return to a greater leadership position.[21] Shaich agreed and served as Co-Chief Executive Officer, along with Moreton, from March 2012 to August 2013.[22] At that time, Moreton stepped down as Co-Chief Executive Officer, and Shaich resumed his role as sole Chief Executive

---

[16] *Id.* ¶ 50. These directors served from January 2016 until the merger closed.

[17] *Id.* ¶ 51.

[18] *Id.*

[19] *Id.*; Shaich Tr. 936:2–937:10.

[20] Shaich Tr. 937:11–938:1.

[21] *Id.* 940:12–21; *accord* PTO ¶ 51.

[22] PTO ¶ 51.

4

Officer until January 1, 2018.[23] The market and the restaurant industry both recognize Shaich as a visionary.[24]

Moreton joined Panera's board in May 2010, after serving as Executive Vice President and Chief Financial Officer from October 1998 to March 2003 and Executive Vice President and Co-Chief Operating Officer from November 2008 to May 2010.[25] Moreton also served as President and Co-Chief Executive Officer from March 2012 to August 2013, Chief Financial Officer (Interim) from August 6, 2014 to April 15, 2015, and Executive Vice Chairman from August 2013 to July 18, 2017.[26]

Colasacco, the lead independent director, served as an outside director along with directors Hessan, Foulkes, Franklin, Lynch, Stoever, and White.[27]

Panera's relevant management includes Blaine Hurst, who began serving as Panera's Chief Executive Officer after Shaich left that post in January 2018.[28] Prior to that time, Hurst served as Executive Vice President and Chief Transformation and

---

[23] *Id.*; *see also* JX0005.

[24] PTO ¶ 98.

[25] *Id.* ¶ 52.

[26] *Id.*

[27] *See id.* ¶¶ 53–59.

[28] *Id.* ¶ 60.

Growth Officer from December 2010 to December 2016.[29]  Then, Hurst served as Panera's President from December 2016 to January 2018.[30]

Michael Bufano has served as Panera's Chief Financial Officer, since April 2015.[31]  Bufano also served as the Vice President of Planning from July 2010 to August 2014.[32]

Andrew Madsen was Panera's President from May 2015 to December 9, 2016, when he left the Company.[33]

A.     Shaich Founds Panera And Leads It Through Unmatched Growth.

In 1980, Shaich founded a single 400-square-foot cookie store.[34]  That store would eventually become Panera.  In 1982, Shaich merged the cookie store with a small regional bakery called Au Bon Pain.[35]  That entity purchased the Saint Louis Bread Company in 1987.[36]  Shaich took this company public in 1991,[37] rebranded the Saint Louis Bread Company as Panera in 1997, and divested the Au Bon Pain

---

[29] *Id.*

[30] *Id.*

[31] *Id.* ¶ 61.

[32] *Id.*

[33] *Id.* ¶ 62.

[34] *Id.* ¶ 86; Shaich Tr. 924:4–17.

[35] PTO ¶ 86.

[36] *Id.*

[37] *Id.*; Shaich Tr. 926:20–927:3.

division in 1999.[38]  After the divestiture, Shaich changed the company's name to Panera Bread Company.[39]  After divesting Au Bon Pain, Panera stock traded at $6.00 per share.[40]

Panera pioneered a new restaurant segment called "fast casual," which found a niche between "quick service restaurants like McDonald's and Wendy's and restaurants like that and casual dining, full sit-down service."[41]  From 2000 to 2010, Panera expanded rapidly into a national restaurant chain.[42]  Panera operated in three segments:  company bakery-cafe operations, franchise operations, and fresh dough and other product operations.[43]  By 2004, Panera's stock was trading around $30.00 per share, and by 2010, it was trading around $70.00 per share.[44]

Despite the Company's growth, by 2010 or 2011, Shaich felt "great distress" because Panera's same store sales were weakening and market share gains slowed.[45]

---

[38] PTO ¶ 86.

[39] *Id.*

[40] JX0400 at 17.

[41] Moreton Tr. 710:23–711:12.

[42] Moreton Tr. 714:5–20, 732:11–24.  From 2007–2009, Panera also expanded by acquiring Paradise Bakery & Café, a Phoenix, Arizona-based concept with over 70 locations in 10 states.  PTO ¶¶ 87–88.

[43] PTO ¶ 92.

[44] *See* JX0400 at 18.

[45] Shaich Tr. 938:2–16.

Increasingly, Panera faced competitive pressures and needed to differentiate for future growth.[46] In response to these pressures, Shaich spent his time as Executive Chairman focusing almost exclusively "on a range of strategic and innovation efforts for Panera."[47] During this time, Shaich wrote "the Amazon memo" on how he would compete with Panera if he were not part of the Company.[48] His vision focused on changing the guest experience, creating a new ordering system, and providing a delivery service.[49] After discussing these initiatives with Moreton, Shaich led the effort to prototype these ideas during the 2010–2012 period before re-assuming a management post as co-CEO in 2012.[50]

In 2013, Panera signaled to the market that it was "deploying significant transaction-driving initiatives."[51] By early 2014, *Fortune* magazine featured Panera's "big bet on tech," detailing how Shaich's early prototypes had developed into new company initiatives.[52] After launching that technology in fourteen cafes,

---

[46] *Id.* 938:2–939:22.

[47] PTO ¶ 102.

[48] Shaich Tr. 938:7–939:8.

[49] *Id.* 938:7–939:10.

[50] *Id.* 938:7–939:16; *see also* PTO ¶ 51; Moreton Tr. 742:23–743:8.

[51] JX0006 at 1.

[52] *See* JX0007 (examining Panera 2.0 and the associated costs of the investments); *see also* JX0008 (CheatSheet article detailing the purchase of a "to-go bread bowl via smart phone").

the Company formally announced the Panera 2.0 initiative in April 2014.[53]  Panera 2.0 offered "a series of integrated technologies to enhance the guest experience"[54] through "new mechanisms for ordering, payment, food production, and, ultimately, consumption."[55]  Panera 2.0 enhanced ordering through Rapid Pick-Up, fast lane kiosks, and online/mobile ordering.[56]  Panera also committed to "operational excellence" with new production equipment and systems to increase capacity and accuracy.[57]  Along with these changes, Panera focused on "activat[ing] innovation in store design."[58] To adopt these initiatives, Hurst "create[d] a 'digital flywheel' whereby all systems and consumer touchpoints—point of sale (PoS), back of house, integrated customer data, big customer data, one-to-one marketing—are interconnected for operational gain."[59]

These initiatives rolled out in stages.  In 2014, the Company kicked off Panera 2.0 with Rapid Pick-Up, an advanced ordering system.[60]  Over the next two years,

---

[53] JX0009 at 1–2.

[54] *Id.* at 1.

[55] *Id.* at 2.

[56] *Id.* at 1–2.

[57] *Id.* at 2.

[58] Shaich Tr. 946:3–8.

[59] JX2009 at 2; *accord* JX0564 at 79.

[60] PTO ¶¶ 113–14.

the Company rolled out the remaining Panera 2.0 initiatives to all company-owned bakery-cafes.[61]

Panera developed other initiatives during this period of innovation. In 2013, the Company rolled out two initiatives including Panera at Home, providing consumer packaged goods, as well as Panera catering hubs, which were attached to bakery-cafes.[62] In 2015, Panera launched its "Food As It Should Be" campaign, developing "clean food" without "artificial colors, flavors, preservatives, and sweeteners."[63] In 2016, Panera rolled out its national delivery program.[64]

While leading Panera through these initiatives, in early February 2015, Shaich informed the board that he wanted to step away from Panera and pursue other endeavors.[65] Shaich had returned to Panera when Moreton needed him. And although Shaich extended his time with the Company through 2015, he did not want to remain at Panera forever.[66] Shaich explained to the board that after working on innovations as Executive Chairman during the 2010 to 2012 period, he "had come back to transform" Panera and felt he had "done [his] work in getting [Panera 2.0]

---

[61] *Id.* ¶¶ 115, 121, 126.

[62] *Id.* ¶¶ 106–109.

[63] Shaich 945:19–23.

[64] PTO ¶ 122.

[65] Moreton Tr. 718:21–719:11.

[66] Shaich Tr. 1017:23–1018:10.

10

going."[67]  The board outlined a succession plan during a board meeting held on February 26, 2015.[68]  The identified succession candidate, Madsen, became Panera's president in May 2015 with the intention of replacing Shaich as CEO in 2016.[69]  But the board did not view Madsen as a suitable replacement,[70] so Shaich stayed on as CEO.  Shaich annually reminded the board of his desire to leave.[71]  At the time of the merger, Shaich owned approximately six percent of Panera's outstanding stock.[72]

### B. Panera Tracks Its Initiatives Through A Five-Year Strategic Plan And Five-Year Financial Model.

In May 2015, management assembled all of Panera's new initiatives into a strategic plan (the "Five-Year Strategic Plan").[73]  To track the financial effects of these initiatives, management also created a five-year financial model (the "Five-Year Financial Model") that tracked "between 15 and 30 key initiatives and many projects underneath each of them that we had various assumptions on, how they would perform, how they would roll out" and forecasted five years of future results.[74]

---

[67] *Id.* 1017:23–1018:10.

[68] JX0010 at 3; *accord* Moreton Tr. 718:14–719:11.

[69] PTO ¶ 62.

[70] Moreton Tr. 800:3–17.

[71] Shaich Tr. 1017:23–1018:10.

[72] *Id.* 1026:11–24.

[73] PTO ¶ 117; JX0315; Moreton Tr. 724:4–725:6.

[74] Moreton Tr. 724:18–22, 768:19–769:8; *accord* PTO ¶ 118.

Management based the Five-Year Financial Model on the Five-Year Strategic Plan and would evaluate them side-by-side "to really understand what the vision involved and the costs involved in what we saw."[75] This Five-Year Financial Model operated as a "roadmap" that management updated every six months and that the board discussed, at least in part, at every meeting.[76]

At its core, the 2015 Five-Year Financial Model set a goal to double earnings per share over the next five years and "re-engage" double-digit earnings growth, including projected earnings before interest, tax, depreciation and amortization ("EBITDA") of nearly $750 million by 2019.[77] Shaich recognized that "[f]ew companies have taken on as audacious a path to renewal."[78]

---

[75] Moreton Tr. 724:4–725:6.

[76] PTO ¶ 118; *see also* Moreton Tr. 734:19–735:4, 764:17–765:8; Shaich Tr. 1015: 19–21; Colasacco Dep. 197:19–198:19. Petitioners object to Respondent's use of Colasacco's deposition testimony at trial. *See* D.I. 108 ¶ 216; D.I. 131; D.I. 148 Ex. A at 9. Under Court of Chancery Rule 32, "[t]he deposition of a witness, whether or not a party, may be used by any party for any purpose if the Court finds . . . that the witness is out of the State of Delaware, unless it appears that the absence of the witness was procured by the party offering the deposition." Ct. Ch. R. 32(a)(3)(B). Colasacco is a Massachusetts resident and Petitioners do not contend that Panera procured Colasacco's absence from Delaware. D.I. 119 at 24:2–14, 25:9–11. Petitioners argue that even if the testimony could come in under Rule 32, Delaware Rule of Evidence 802 precludes this testimony. *See* Trial Tr. at 642:11–16. Rule 32 testimony is not an out of court statement, but treated "as though the witness were then present and testifying." Ct. Ch. R. 32(a). Colasacco's testimony is thereby admissible under Rule 32.

[77] JX0315 at 3–4; *accord* Shaich Tr. 941:10–943:18 ("So I had a goal of sustained double-digit earnings but reengaging this company and moving it forward—it was mature—and taking it to the next place.").

[78] JX0315 at 131; JX0134 at 118.

Some board members were skeptical. Moreton described the Five-Year Financial Model as "what's classically called a hockey stick projection" that faced "healthy skepticism in the board."[79] Lynch wrote to Shaich in October 2016, "I worry, *though not with a lot of basis*, that we are overestimating our future earnings power. We are now in a negative 3 transaction comp environment and I am concerned that we *could* be overestimating our ability to fight this headwind."[80] Moreton recognized management risk-adjusted the Five-Year Financial Model "in part," but "major" risk remained around execution.[81] Colasacco considered Panera's Five-Year Strategic Plan as "not impossible, not a lie, not a bad faith effort in any way," but "one possible range of scenarios that could play out[.]"[82] Some analysts

---

[79] Moreton Tr. 729:2–20; *accord* Colasacco Dep. 217:3–219:15 (understanding that "if it worked I would have considered it a home run," but recognizing "there aren't many companies that can do" "25 percent per annum compounded for five years," so the model "had some risk attached to achieving it").

[80] JX0228 at 2 (emphasis in original).

[81] Moreton Dep. 218:23–219:20 ("So the risk then switches to: Is it possible? Yes. Is it a guarantee? No. And what's the major . . . risk . . . is around execution. So . . . that's really the time period that we're in and how Panera saw it during my time."). Petitioners identify the Company's 90% confidence in its ability to achieve several initiatives in the model. *See* JX0616 at 29. In using this to cast the Five-Year Financial Model as risk adjusted, however, Petitioners improperly conflate the model's "comp buffer"—designed to learn how different initiatives overlap—with risks associated with competition or execution. *See* Moreton Tr. 740:4–741:15, 860:15–861:7.

[82] Colasacco Dep. 217:3–219:15.

13

agreed: "[W]e remain on the sidelines as PNRA's stock appears to incorporate the benefits of its strategic initiatives and the outlook is not without risks."[83]

## C.     Investors React, And Panera Weighs Its Options.

In reaction to the Five-Year Strategic Plan, an investment fund called Luxor Capital threatened a proxy contest because it opposed the "very significant capital spending" necessary to support the plan.[84]  The board engaged Goldman Sachs & Co. LLC ("Goldman") in March 2015 to advise it in a strategic review of potential opportunities to maximize stockholder value.[85]  On June 25, 2015, Goldman presented potential strategic alternatives alongside valuation scenarios under the Five-Year Strategic Plan.[86]

Consistent with the Five-Year Financial Model, Goldman "assume[d] 100% implementation success with no probability weighting adjustment."[87]  For this reason, Goldman called the Five-Year Strategic Plan "aggressive" because "everything would have to go exactly as was foreseen," which "[t]hey didn't think

---

[83] JX0104 at 1; *see also* JX0343 at 19 (analysts acknowledging that Panera's strategic initiatives were "a very ambitious target").

[84] Moreton Tr. 720:18–721:20; Colasacco Dep. 65:19–66:20.

[85] PTO ¶ 75.

[86] *See* JX0019 at 18–25; PTO ¶ 120.

[87] *See, e.g.*, JX0019 at 19–20, 24, 33, 34, 41, 42, 44, 50, 52, 56.

14

[] was very likely."[88] Goldman advised that Panera's "growth initiatives were too early on in the game for the market . . . to give [Panera] full credit for [the Five-Year Strategic Plan]."[89] Goldman evaluated a potential sale and advised that a financial sponsor would not have interest in Panera,[90] but identified a "limited number of potential strategic buyers," with Starbucks as the most likely.[91] At the end of the meeting, the board determined

> that while the Company would, as it had done in the past, continue to observe the markets and consider activities in the best interest of shareholders on an ongoing basis, given current conditions it was not in the best interest of the Company and its stockholders to engage in a process to initiate and pursue a strategic transaction or solicit interest from potential purchasers at this time.[92]

After consulting with Goldman, Panera agreed to some of Luxor's demands.[93] Luxor dropped their remaining demands after Panera "convince[d] them that [its]

---

[88] Moreton Tr. 773:9–774:5.

[89] *Id.* 770:24–771:15.

[90] JX0019 at 18; Shaich Tr. 956:4–22; Moreton Tr. 770:24–771:19.

[91] *See* Shaich Tr. 955:24–957:7, 958:1–19; *accord* Moreton Tr. 770:24–771:19.

[92] JX0019 at 2.

[93] *See* Moreton Tr. 722:11–19 ("[W]e agreed to increase our share buyback, again a program we'd had going on for a long time, but we agreed to buy back $500 million worth of shares over a 12-month period. We agreed to evaluate selling company stores to franchisees without a specific number.").

G&A actually was average to low for the industry as a whole, and the technology investments were necessary for initiatives."[94]

**D.** **Panera Counteracts Failures And Plants Seeds For Future Rewards.**

In 2016, following the adoption of the Five-Year Strategic Plan, Panera reduced its estimate for 2019 EBITDA by almost $128 million as "revenues hadn't increased in line with" expectations and the Plan was not "going quite as smoothly as [Panera] had hoped."[95]  Panera offset the initiatives' high costs by orchestrating share buybacks, refranchising, and implementing nonstrategic cost reduction.[96]

In the wake of this setback, Shaich led efforts to publicize the Five-Year Strategic Plan to generate market recognition.  Through "hundreds"[97] of presentations, Shaich shared Panera's plan of "sustained double-digit EPS earnings growth."[98]  The market responded and gave Panera "a great deal of credit for the initiatives already done."[99]  Panera's stock rose to $214.54 by July 2016.[100]

---

[94] *Id.* 722:11–23.

[95] *Id.* 776:5–778:16, 778:17–779:2.

[96] *Id.* 785:17–786:8; JX0238 at 33.

[97] Shaich Tr. 948:6–13, 960:8–961:3; *see, e.g.* JX0194 at 1; JX0192 at 5, 11; JX2028 at 3, 17; JX0032 at 51; JX0041 at 5, 22; JX0064 at 2; JX0260 at 4–5, 15; JX0331 at 3–4; JX0345 at 4–5, 14; JX0029; JX1039; JX0063 at 3; JX0304.

[98] JX0063 at 3.

[99] Moreton Tr. 792:4–13.

[100] JX0104 at 1.

### E. Panera and Shaich Weigh Their Options.

In the midst of Shaich's PR campaign, Shaich received an unusual call from Starbucks CEO Howard Schultz, proposing a visit.[101] Shaich discussed the visit with Colasacco and other board members, explaining, "Howard doesn't come up on a Saturday afternoon for just anything. Maybe he [i]s interested in a transaction."[102] To prepare, Shaich asked Goldman for an updated comparison of selected restaurant companies that Goldman had presented the year before in 2015.[103] This comparison included updated financial metrics for Starbucks and other restaurants in the fast growth, quick service, and casual dining segments.[104]

When Schultz and Shaich met on July 31, 2016, Schultz proposed a collaboration between Starbucks and Panera "whereby Panera would provide food to Starbucks for lunch and breakfast and [Starbucks] would upgrade [Panera's] coffee program."[105] After the meeting, Shaich updated Moreton, Colasacco, and Lynch.[106] Lynch viewed this as "[t]he first step of the dance," so that Starbucks

---

[101] Shaich Tr. 965:11–966:5; *accord* Moreton Tr. 793:14–22.

[102] Shaich Tr. 967:13–19.

[103] JX0111.

[104] *See id.* at 4–5.

[105] *See* JX0110; JX0118; JX0772 at 56; Moreton Tr. 793:14–22.

[106] JX0116; JX0118; JX1012; *accord* Shaich Tr. 968:22–969:5.

17

could pursue "a potential acquisition attempt by Starbucks of Panera."[107] Colasacco commented that the proposed collaboration was "[c]ertainly worth exploring further, though raises many questions."[108] And Moreton thought it was "interesting . . . even if not tying every thing up in a nice bow."[109]

At the August 2 board meeting, the board reviewed elements of the Five-Year Strategic Plan and Five-Year Financial Model, per usual.[110] During the executive session of that meeting, Shaich informed the board about Starbucks' proposed collaboration.[111] Moreton characterized the board's response by explaining, "if [Starbucks] wanted to take advantage of our food and things, the best way to do that would be to acquire the company."[112] With that directive, Shaich had a new focus for future conversations with Schultz.[113]

Schultz had invited Shaich to Seattle to visit Starbucks' roastery that fall;[114] the teams met October 4 through 5.[115] Starbucks came to discuss a joint venture,

---

[107] JX0118; Shaich Tr. 969:17-970:1.

[108] JX1012.

[109] JX0116.

[110] *See* JX0122 at 2; JX0128.

[111] JX0116; JX0122 at 1; JX0125 at 4; *accord* Moreton Tr. 794:8–796:8.

[112] Moreton Tr. 796:3–8.

[113] *See id.* 796:9–17.

[114] *See* JX0239 at 2–3.

[115] *See* JX0156; JX0153; *accord* Shaich Tr. 970:14–21.

with Starbucks selling Panera's food and Panera selling Starbucks coffee.[116] Shaich used this opportunity to attempt to solicit an offer.[117] Both Shaich and Schultz discussed their companies' "very intimate strategic plans."[118] During the visit, Shaich pitched Schultz the Five-Year Strategic Plan.[119] On October 26, Shaich rejected Schultz's joint-venture idea, but floated the idea that Starbucks could purchase Panera.[120] Schultz responded: "we're really interested in this. Let's get a group of people to work on it."[121]

Moreton worked with Shaich to interface with Starbucks and help conduct financial analyses.[122] In November, the companies discussed their shared goal "to determine whether [the] companies can unlock significant value by combining."[123] Panera proposed EBITDA and synergies figures for the combined companies, which Starbucks generally found reasonable.[124] Starbucks took this analysis and ran the

---

[116] *See* JX0156 at 4.

[117] Shaich Tr. 970:6–972:8.

[118] *Id.* 971:20–972:8.

[119] *Id.* 970:14–21.

[120] JX0197; *accord* Shaich Tr. 972:12–973:3.

[121] Shaich Tr. 973:4–16.

[122] JX0243; JX0250; Moreton Tr. 797:2–798:22; Shaich Tr. 974:2–10.

[123] JX0243.

[124] *See* JX0250; Moreton Tr. 798:6–17.

numbers internally.[125] At the end of November,[126] Schultz called Shaich to explain that after giving it "some serious thought,"[127] Starbucks was "not going forward" with the transaction.[128] Although Starbucks viewed the combination as a "pretty good idea," Starbucks could not "get to [Panera's] public market price, let alone pay a premium"[129] and "there were other things going on within Starbucks."[130] The parties did not discuss any further.[131]

In tandem with Panera's conversations with Starbucks, in August 2016, Shaich acted on his own initiative and asked Goldman to facilitate an introductory meeting with JAB.[132] Goldman inquired after JAB's CEO Olivier Goudet,[133] but JAB postponed meeting with Panera until "early the next year"[134] because JAB was busy pursuing an acquisition that fall.[135]

---

[125] Moreton Tr. 796:21–797:1.

[126] JX0266; JX0263.

[127] Shaich Tr. 973:4–11.

[128] *Id.* 975:15–24.

[129] *Id.* 974:11–22, 975:15–976:10; *accord* JX0625 at 4 ("There were conversations with Starbucks last year, they ultimately declined to proceed citing that Panera was trading too richly (and it has since only traded up)."); JX0772 at 56; Moreton Tr. 798:23–799:10.

[130] Shaich Tr. 976:1–4.

[131] Moreton Tr. 799:24–800:2.

[132] Shaich Tr. 976:11–23; *accord* Bell Tr. 1143:12–15.

[133] Bell Tr. 1143:4–22.

[134] *Id.* 1143:16–22.

[135] *Id.* 1143:12–22; *accord* Shaich Tr. 976:24–977:6.

### F.     Panera Reaches An "Inflection Point," And Shaich Engages With JAB.

Although Panera continued to face competitive pressures, it experienced impressive growth and success with its initiatives.  Panera's stock price rose from $170.00 per share in 2014 to $210.00 per share in early December 2016.[136]  As of October 2016, Panera was the ninth most valuable restaurant company in America with a market capitalization of $4.5 billion.[137]  Panera completed its Panera 2.0 rollout for company-owned bakery-cafes by the end of 2016.[138]   And by the end of 2016, Panera served approximately 9 million customers per week, making it one of the largest food service companies in the United States.[139]

By January 13, 2017, Panera removed all of its "No No List" ingredients in pursuit of its "clean food" goal.[140]  Panera hit another benchmark on February 8, 2017, when MyPanera accounted for 51% of the Company's transactions, becoming the largest customer loyalty program in the restaurant industry.[141]  Other Panera 2.0

---

[136] Moreton Tr. 792:4–13; *accord* Shaich Tr. 976:5–10; JX0631 at 10.

[137] JX1041 at 4.

[138] PTO ¶ 126.

[139] *Id.* ¶ 91.

[140] *Id.* ¶ 127; JX0306.

[141] PTO ¶ 129.  Panera completed rollout of its MyPanera customer loyalty program in November 2010.  *See* JX0003.

initiatives experienced success, with digital orders representing 26% of sales[142] and the Rapid Pick-Up Program representing about 9% of sales.[143]

On February 7, 2017, Shaich announced 2017 to be Panera's "inflection point"[144]: "[w]ith peak investments and significant scale behind us, we are now focused on completing the rollout of our initiatives and reaping the benefits."[145] In particular, "[t]he company has guided to double digit EPS growth for 2017."[146] The market reacted positively to this announcement and Panera's stock rose $20.00 that day.[147]

In this positive environment, Shaich prepared to meet JAB's Chief Executive Officer, Olivier Goudet, and Head of M&A, David Bell.[148] Shaich prepared for the meeting with Goldman, who arranged his introduction to JAB.[149] Shaich informed some of Panera's directors before the meeting, and Colasacco helped Shaich gather JAB's public information.[150] JAB hosted Shaich at its Washington, D.C. office on

---

[142] JX0741 at 1.

[143] JX0359 at 4.

[144] JX0331 at 3–4.

[145] JX0342 at 7.

[146] JX0129 at 1.

[147] *See* Moreton Tr. 801:20–21; JX0364 at 1; JX0342 at 7.

[148] JX0334.

[149] Shaich Tr. 976:11–977:6; *accord* JX0318; JX0334.

[150] *See* Shaich Tr. 977:17–978:7; JX0338.

February 9.[151] During the meeting, Shaich presented Panera's standard external investor presentation.[152] Bell interpreted the presentation as a way to try to entice JAB to come and make an offer for Panera.[153] During his pitch, Shaich discussed his thirty-year career at Panera, but was "very uncertain" about his personal plans.[154] Shaich saw that Goudet's eyes lit up as Shaich discussed Panera.[155]

On Friday, February 24, Shaich, Goudet, and Bell had a follow-up phone discussion during which JAB expressed its interest in acquiring Panera.[156] The next day, Shaich and Colasacco met to discuss JAB's expression of interest.[157] At this time, Shaich did not engage a financial advisor or engage in negotiations.[158] Shaich planned to inform the rest of the board at the upcoming Wednesday, March 1 board meeting.[159]

---

[151] PTO ¶ 130.

[152] *See* JX0374; PTO ¶ 130.

[153] Bell Tr. 1147:11–1148:8.

[154] *Id.* 1148:9–22.

[155] Shaich Tr. 1043:15–1043:24.

[156] PTO ¶ 131.

[157] *See* JX0287 at 9; *accord* Shaich Tr. 980:11–981:4; 1045:15–22.

[158] Shaich Tr. 1044:5–1044:24.

[159] PTO ¶ 131; JX0407 at 1; JX0408 at 3–4.

At that board meeting, Shaich informed the full board of JAB's interest.[160] Shaich did not mention that he had initiated the conversation with JAB.[161] The board discussed Shaich's introductory meeting and conversations with JAB, as well as JAB's potential interest in an acquisition of the Company.[162] "[T]he Board authorized Mr. Shaich to continue conversations with JAB and to report back to the Board with an update as to the discussions and the status of any offer."[163] At that time, the board did not retain a financial advisor, as it had not received a formal offer.[164]

At this same meeting, the board reviewed 2016 financial results and tracked them against the Five-Year Strategic Plan and the projections in the Five-Year Financial Model.[165] Panera management typically updated the Five-Year Financial

---

[160] JX0408 at 3–4.

[161] Shaich Tr. 1048:2–1048:17.

[162] PTO ¶ 131; JX0408 at 3–4.

[163] PTO ¶ 131; JX0408 at 4.

[164] Shaich Tr. 984:14–23 ("I don't think anybody on the board, myself or anybody on the board would have thought to bring an investment banker in. We had been through this kind of process before, and bankers are very expensive, and we had no offer. So I think we needed to understand, what was JAB going to say."); *accord* Moreton Tr. 804:18–805:1; Colasacco Dep. 138:18–139:15.

[165] *See* JX0407 at 47–102; JX0408 at 1 ("The agenda for the Board of Directors meeting included the following matters: administrative matters, Special Focus topics, including a review of the 2016 Key Initiatives, 2017 Key Initiatives and financial plan and related business strategy updates, review of financial results . . . .").

Model every spring and fall since May 2015.[166]  In March, management updated the Five-Year Financial Model in preparation for merger discussions with JAB.[167]

## G.     JAB Makes An Offer, And Both Parties Secure Advisors.

On March 10, 2017, Shaich met with Bell and Goudet in Washington D.C.[168] JAB offered to acquire Panera at a price of $286.00 per share in cash.[169]  At this time, Panera's stock was trading at $234.91; the offer represented a 21.7% premium.[170]

JAB was a serial acquirer that maintained a "playbook" for their acquisitions.[171]  Following that playbook, JAB conditioned their offer to Panera on (i) a confidentiality provision; (ii) a public support measure for Shaich and certain affiliates; (iii) a no-shop provision with a fiduciary out; (iv) matching rights; and (v) a 4.0% termination fee.[172]  JAB's terms did not include a financing or regulatory condition.[173]  JAB expressed the desire and ability to sign on April 7, 2017, with an

---

[166] PTO ¶ 118; Moreton Tr. 780:24–781:9, 859:4–16.

[167] Moreton Tr. 828:22–830:18.

[168] PTO ¶ 132.

[169] *Id.*

[170] JX0631 at 6.

[171] Bell Tr. 1107:24–1108:22; Shaich Tr. 1039:22–24.

[172] PTO ¶ 132.

[173] *Id.*

25

announcement on April 10, 2017.[174]  At trial, Bell explained the "playbook."[175]

Regarding the deal's speed, JAB was "not interested in a protracted negotiation that

results in significant management distraction, so they always go very quickly."[176]

Because of this short timeline, JAB also never discusses post-merger leadership roles

during negotiations.[177]  Bell also explained that a bilateral deal is part of the JAB

playbook in part because it typically leads to the lowest price.[178]

JAB hired Ernst & Young in March 2017 to conduct their due diligence

review of Panera.[179]  JAB conducted their diligence in five days because Panera's

public information and "transparency is off the charts."[180]  During the process, Bell

expressed satisfaction with the smooth diligence and was "really impressed by the

speed and quality of the data."[181]  He also noted that Panera was one of the "cleanest

companies they have ever seen."[182]

---

[174] *Id.* ¶ 133.

[175] Bell Tr. 1104:2–1106:9, 1107:24–111:8.

[176] JX0581.

[177] Bell Tr. 1109:17–1111:8.

[178] Bell Dep. 49:9–14.

[179] PTO ¶¶ 79–80.

[180] JX0581.

[181] *Id.*

[182] *Id.*

As for financing, Goudet told Shaich that JAB would "use [Goldman] for our financing, so it is logical we take them on the buyside."[183]  Shaich and Moreton were not concerned about using another advisor, despite Panera's prior relationship with Goldman.[184]  JAB recommended that Panera use Adam Taetle from Barclays or David Ciagne from Morgan Stanley because it was "important [for Panera] to pick someone who understands [JAB's] playbook, otherwise could be dangerous."[185]  Ciagne was JAB's coverage banker at Morgan Stanley.[186]

Upon receipt of an offer, on March 14, the board engaged advisors.  The board retained Sullivan & Cromwell LLP ("Sullivan & Cromwell") as the board's outside

---

[183] JX0418 at 2.  Goldman participated in a $3 billion credit facility in connection with the merger.  Goldman agreed to provide 33.3% of the credit facility, along with J.P. Morgan Chase & Co. and the Bank of America Corporation.  PTO ¶ 76.

Petitioners moved to restrict Respondent's use of any JAB evidence to support its case.  *See* D.I. 139 at 12 n.53.  I considered and denied this argument in my March 20, 2019 bench ruling on Petitioners' motion in limine.  *See* D.I. 111.  I maintain that Petitioners' attempt and failure to obtain additional discovery in the Netherlands precludes their later attempt to restrict use of any documents in this Court.  *See id.* at 5:9–6:9. Petitioners deposed Bell and received documents from Bell as a custodian.  Petitioners used Bell's testimony and JAB documents in its post-trial arguments.  Petitioners have not shown that Respondent relied on any JAB documents that were not produced in discovery. For these reasons, along with those explained in my March 20 bench ruling, Petitioners' request is denied.

[184] Moreton Tr. 775:17–22; Shaich Tr. 988:19–999:4 ("I knew Goldman, but I knew many bankers.  I had worked with others.  And I think that I felt we could be well represented in many ways.").

[185] JX0418 at 2.

[186] Kwak Tr. 1194:7–13.

legal counsel for the potential transaction with JAB.[187] Frank Aquila served as Sullivan & Cromwell's lead partner on the matter.[188] Shaich proposed engaging Barclays Capital or Morgan Stanley as Panera's financial advisor,[189] but did not tell the board that JAB had suggested those firms, or specifically Ciagne.[190] After deliberation and discussion, the board directed the Company to explore a potential engagement and selected Morgan Stanley as its financial advisor.[191] Specifically, on Aquila's recommendation, Panera selected Michael Boublik of Morgan Stanley.[192] Boublik had not worked for JAB, and neither Bell, nor anyone else at JAB, knew him.[193]

On March 15, Morgan Stanley cleared an initial conflicts check.[194] Two days later, Morgan Stanley gave Panera a key request list that included the Five-Year

---

[187] PTO ¶ 77.

[188] *Id.* ¶ 78.

[189] *Id.* ¶ 135.

[190] *See* JX0421 at 2.

[191] PTO ¶ 135; JX0421 at 2. On March 15, the board initiated the engagement process with Morgan Stanley. PTO ¶ 137. On April 2, the Company entered into an engagement letter with Morgan Stanley. JX0596.

[192] JX0466 at 2. Boublik was the lead senior banker from Morgan Stanley advising Panera management and the board in connection with the potential transaction with JAB during the Panera engagement. At Morgan Stanley, he served as Chairman of M&A for the Americas and Managing Director. PTO ¶ 71.

[193] Bell Tr. 1113:21–1114:4.

[194] PTO ¶ 141.

28

Strategic Plan, and started putting together initial valuation metrics.[195]  Then, on March 20, Sullivan & Cromwell informed the board that Morgan Stanley "had cleared an initial conflicts check on March 15 and the parties were now negotiating an engagement letter for the transaction."[196]

On March 29, Panera management and Morgan Stanley met to review the Five-Year Strategic Plan and Five-Year Financial Model as updated after the March 1 board meeting.[197]  Paul Kwak, a Vice President of M&A at Morgan Stanley,[198] prepared questions about Panera's Five-Year Financial Model.[199]  In conducting its analysis, Morgan Stanley "immediately noticed that [management projections] were clearly more bullish and had higher growth, higher margins than what the street consensus was,"[200] but used the Five-Year Financial Model to develop its management case DCF analysis.[201]

---

[195] JX0689; Kwak Tr. 1256:8–1258:8.

[196] JX0448 at 1.

[197] PTO ¶ 151.

[198] *Id.* ¶ 72.

[199] *See* JX0606.

[200] Kwak Tr. 1219:23–1220:16.

[201] *See* JX0625 at 3.

On March 30, the bank sent its engagement letter.[202] Panera agreed to pay Morgan Stanley $42 million: $8 million became payable upon execution of the merger agreement, and the remainder was contingent upon closing.[203] The disclosure letter identified the scope of conflict and formally disclosed all of Morgan Stanley's prior dealings with JAB.[204] Morgan Stanley disclosed they "have provided, currently are providing, and/or in the future may provide, certain investment banking and other financial services to the Company, The Potential Buyer, and the Buyer Related entities."[205] Morgan Stanley also included in the letter that other than Patrick Gallagher, no senior deal team member "is a member of the coverage team for the Potential Buyer or the Buyer Related Entities."[206]

Even though Panera's deal team did not include any JAB coverage bankers, a JAB coverage banker twice passed messages between the JAB and Panera deal teams. First, on March 27 (before execution of the engagement letter), Ciagne emailed Boublik to communicate JAB's fears that Morgan Stanley was not doing enough to assure Panera that JAB could finance the deal.[207] Second, on April 1,

---

[202] JX0562.

[203] JX0789 at 52–53.

[204] PTO ¶ 155; JX0562.

[205] JX0562 at 2.

[206] *Id.* at 3.

[207] *See* JX2021.

Boublik caused Ciagne to deliver the board's message to JAB that "Panera is serious, and there has to be a higher price."[208] The board did not know that Ciagne had previously communicated with Boublik about financing.[209] Indeed, Shaich and Moreton learned about that communication for the first time at trial.[210]

## H. Panera Rejects JAB's Offer, And JAB Compresses The Timeline.

On March 14, the board met to discuss JAB's $286.00 offer.[211] The board agreed that JAB would need to raise its offer and authorized Shaich to pursue further discussions in pursuit of a higher price.[212] The board instructed Shaich to inform JAB "that the Board would not agree to any proposed offer for the Company that was not significantly higher than the $286.00 per share currently proposed by JAB."[213]

The next day, Morgan Stanley conducted initial valuation work with Panera's trading history, trading multiples, and precedent transaction multiples.[214] From this

---

[208] Moreton Tr. 837:9–838:9.

[209] Shaich Tr. 1068:21–1070:1.

[210] *Id.* 1068:21–1070:1; Moreton Tr. 905:7–908:11.

[211] PTO ¶¶ 134, 136.

[212] *Id.* ¶¶ 134, 136.

[213] *Id.* ¶ 134.

[214] *See* Kwak Tr. 1208:6–1209:9.

and JAB's bidding precedents, Morgan Stanley was comfortable that it could negotiate a price that was above $300.00.[215]

On March 17, Morgan Stanley advised Shaich and Moreton on JAB's historical bidding approach and helped them formulate a strategy to raise JAB's offer price.[216] Shaich stayed up until 3 a.m. digesting JAB's historical bidding approach.[217] While reviewing, Shaich wrote to Moreton that he wanted to push JAB on price; Moreton cautioned him not to push it too hard by being too greedy, because "pigs get fat, hogs get slaughtered."[218]

The next day, on March 18, Shaich informed JAB that although the board approved continued discussions and targeted due diligence, it expected that JAB would have to increase their $286.00 offer north of $300.00 per share.[219] JAB agreed to discuss the possibility of offering a higher price internally and to get back to Shaich on March 20.[220]

---

[215] *See id.*.

[216] JX0455.

[217] *See* Shaich Tr. 996:10–997:5.

[218] JX0435; *accord* Moreton Tr. 822:9–823:1.

[219] PTO ¶ 139.

[220] *Id.*

On March 20, JAB made a second offer of $296.50 per share, with the warning that JAB would "not go one penny over 299. We're not going to hit 300."[221] Panera's stock had closed at $255.24 the day before, so the offer represented a 16.2% premium to that trading price.[222] The board met that same day to review the second offer.[223] The board "supported continued discussions with JAB and JAB initiating due diligence on the Company but expressed its expectation that any final offering price be significantly higher."[224] Boublik agreed and commented, "I would hope that we get another collective move of at least the same magnitude."[225]

On March 22, Shaich and Moreton communicated to Bell and Goudet the board's expectation to Bell and Goudet that JAB find additional value in the Company.[226] Shaich explained, "You've made a meaningful move once, and I and my board appreciate that, but it's going to take another meaningful move once again . . . I'm confident that once we sit down and go through our business plan and you've done your diligence you'll be able to get there."[227]

---

[221] *Id.* ¶ 140; *accord* Shaich Tr. 1002:9–23; JX0483.

[222] JX0552 at 3.

[223] PTO ¶ 141.

[224] JX0448 at 1; *see also* JX0432 at 2.

[225] JX0456 at 2.

[226] PTO ¶ 142.

[227] JX0494 at 1.

A few days later, on March 26, JAB and Panera signed a confidentiality agreement and discussed the due diligence process.[228] Bell testified that when JAB makes an offer without a financing contingency, they conduct due diligence at "the appropriate level" "to have this minimum amount of information in order to ensure that [they] could get the debt commitments" from their lenders.[229] In these discussions, JAB asked Panera to move up the transaction with an anticipated announcement during the week of April 3.[230] Shaich recognized that JAB wanted to move quickly,[231] but responded that it was "material" to Panera that JAB "robustly (and genuinely) understand the drivers in the business [s]o they can fully appreciate the value that we understand is here and seek from them."[232]

Shaich and Moreton also spoke with their legal and financial advisors about the feasibility, benefits, and risks of JAB's proposed accelerated timeline.[233] The transaction was the fastest in Kwak's career.[234] Nevertheless, Panera's advisors said

---

[228] PTO ¶¶ 144–45.

[229] Bell Tr. 1105:3–1106:9.

[230] *See* PTO ¶ 146.

[231] *See* JX0494 at 1.

[232] JX0491.

[233] PTO ¶ 143.

[234] Kwak Tr. 1254:24–1255:3.

that they had adequate time.[235] The board liked the shortened timeline, valuing less distraction.[236] It was feasible for the board because of its extensive review of the Five-Year Strategic Plan, Panera's financial results, and the Five-Year Financial Model.[237] Shaich understood that the Company's future value lay in its initiatives, so he conditioned the compressed timeline on meeting with JAB to review the Five-Year Strategic Plan and Five-Year Financial Model.[238] JAB agreed and the parties agreed to work toward entering into a definitive agreement during the week of April 3.[239]

On March 27, JAB's counsel provided Sullivan & Cromwell a draft merger agreement and a draft voting agreement.[240] The board did not counteroffer on deal price or deal terms at that time.

Also on March 27, the Company learned that a Bloomberg reporter had called Bell inquiring about a possible sale of Panera.[241] Shaich wrote in an email that he learned this through "a desperate call from [D]avid [B]ell [after] Bloomberg called

---

[235] Moreton Tr. 827:10–24; *accord* Kwak Tr. 1233:10–20.

[236] Colasacco Dep. 142:11–143:15.

[237] *See, e.g.*, Moreton Tr. 748:4–13, 768:13–769:8, 780:22–781:9, 805:2–16, 839:17–840:3; Shaich Tr. 951:18–952:2, 1015:15–21.

[238] JX0491; *accord* JX0490.

[239] PTO ¶ 146.

[240] *Id.* ¶ 149; JX1011.

[241] PTO ¶148; JX0513.

him inquiring about Panera."[242]  At trial, Shaich commented that during the call, Bell had "anxiety in his voice" and "was very nervous and concerned about it."[243]  Despite the JAB playbook's tenet of confidentiality,[244] JAB did not walk after the leak.  Instead, JAB began their diligence in Panera's data room on March 28.[245]

While JAB was conducting their due diligence, Morgan Stanley presented its initial valuation analysis to the board.[246]  At the March 30 board meeting, Morgan Stanley presented seven different valuation metrics to guide the negotiations and frame JAB's outstanding offer of $296.50.[247]  Morgan Stanley also identified and ranked "Potential Interlopers" by their strategic rationale and ability to pay.[248]  In order, these included Starbucks, Chipotle, Restaurant Brands International ("RBI"),

---

[242] JX0513.

[243] Shaich Tr. 1007:7–17.

[244] *See* JX0418 at 2 ("We are making a friendly, confidential offer.  If there is a leak, we will walk away."); Bell Tr. 1104:5–16 (referencing JX0418 and stating "the way we give offers at JAB, among other things, is to require confidentiality.  We think it's in the mutual interests of both parties.  It's just the way we work.  And so we said that fundamental to our offer was the fact that it had to remain confidential."); Kwak Tr. 1196:22–1198:1 (testifying that Morgan Stanley was familiar with the JAB playbook and understood that JAB's threat to walk was real).

[245] PTO ¶ 150.

[246] *Id.* ¶ 154; JX0545 at 1–2; JX0552.

[247] PTO ¶ 154; *accord* JX0552 at 3–12 (valuing the Company through a multiples-based valuation matrix from the street and management cases, historical trading and multiples analyses, comparable companies analyses and a precedent transactions analysis).

[248] JX0552 at 14–15.

Dunkin', Domino's, McDonald's, Yum!, and Darden.[249]  Morgan Stanley ruled out

financial sponsors,[250] focused on strategic buyers like Starbucks, and explained why

others were unlikely to compete.[251]  In its analysis, Morgan Stanley recognized that

Starbucks had "[p]reviously engaged with [Panera] in acquisition discussions," and

"[h]ad mentioned concerns that acquisition multiple would be above where

Starbucks traded."[252]

This analysis fit with Shaich's and the board's deep knowledge of the

industry.[253]  According to Shaich, the "big three" were not viable options:  Starbucks

had just passed on Panera months earlier; Chipotle was in an *E. coli* crisis; and RBI

had just acquired Popeyes.[254]  As for the remainder, Shaich knew Dunkin' very well,

had discussions with them, and knew they were 100% franchised, operated at smaller

volume, and would not be interested in Panera.[255]   Shaich knew Domino's CEO as

a dear friend and understood their business was 100% franchised and 100% pizza

---

[249] *Id.*

[250]  Kwak Tr. 1199:9–1200:3, 1228:18–1229:5.

[251] *See* JX0552 at 14–15.

[252] *Id.* at 14.

[253] Shaich Tr. 1019:18–1021:16; Moreton Tr. 811:19–812:17, 824:3–12, 912:12–16.

[254] Shaich Tr. 1019:18–1020:13.

[255] *Id.* 1020:14–19.

and that they were not acquiring.[256] Shaich previously had discussions with McDonald's and knew that, based on mistakes in their acquisition history, they had pulled back and were not acquiring, so Panera "wouldn't be for them."[257] Shaich also had discussions with Yum! years earlier and knew that, at the time of the merger, Yum! faced activist pressure to leave China and also would not run company stores.[258] Finally, Shaich knew that Darden was acquiring Cheddars and faced activist pressure.[259] Shaich explained: "[I]t was just patently clear to me that, knowing what I know, and knowing these people and where this had played out, that there really wasn't a viable interested party."[260] The board agreed. Moreton explained that "there was nobody else out there talking to [the board] about potentially acquiring [the Company], nor did [the board] think there would be."[261]

---

[256] *Id.* 1020:20–23.

[257] *Id.* 1020:24–1021:4.

[258] *Id.* 1021:5–9.

[259] *Id.* 1021:10–12.

[260] *Id.* 1021:13–16.

[261] Moreton Tr. 811:19–812:17; *accord id.* 912:7–11 ("[T]here was nobody else to reach out to . . . [w]e went through the process.").

## I. JAB Reviews Panera's Five-Year Strategic Plan And Five-Year Financial Model And Makes Their Final Offer.

Shaich met with four JAB leaders on March 31, as well as two of their advisors.[262] The group met for three to four hours, and Shaich presented a deck titled "Five-Year Strategy & Financial Model."[263] The Company presented nonpublic information, including the status of the Five-Year Strategic Plan and the financial projections contained in the Five-Year Financial Model.[264] Days later, on April 2, JAB confirmed its pre-diligence estimates for cost savings[265] and internally revised their target price upwards from $290.00 to $305.00 per share.[266]

The next day, on the morning of April 3, Bloomberg reported that Panera was exploring strategic options, including a possible sale of the Company to potential suitors such as JAB, Starbucks, and Domino's.[267] In response to the leak, Panera's stock price jumped to $261.87, an 8% increase from the pre-public speculation price, and closed at $282.63.[268]

---

[262] JX0546 at 1. These leaders included Bell, Axel Bhat (JAB partner and CFO), Trevor Ashley (JAB principal), and Tim Hennessy (JAB Beech CFO). *Id.*

[263] Shaich Tr. 1010:9–22; JX0564.

[264] *See generally* JX0564; *accord* Moreton Tr. 840:14–23.

[265] JX0593 at 49–50 (confirming JAB's pre-diligence estimates and predicting $365 to $570 million in cost savings).

[266] *Compare* JX0400 at 44, *with* JX0593 at 65.

[267] PTO ¶ 159; JX0609.

[268] *See, e.g.*, JX0631 at 5; JX0982 at 61.

Later that day, on April 3, Shaich, Hurst, and Bufano met with JAB's senior partners including Goudet, Bell, Peter Harf (JAB senior partner), Bart Becht (JAB partner and chairman), and two of their advisors.[269] The Company presented a deck also titled "Five-Year Strategy & Financial Model,"[270] which was substantially similar to the deck delivered to the other JAB leaders on March 31.[271] Both decks contained an in-depth look into the Five-Year Strategic Plan and the Five-Year Financial Model.[272] Both decks discussed Panera's opportunities in international franchising,[273] "Panera At Home" (including coffee),[274] and technology.[275]

The April 3 deck contemplated "other opportunities" that would stem from combining JAB and Panera.[276] These opportunities included joint efforts in consumer packaged goods ("CPG"), coffee, international expansion, technology, marketing, real estate modeling, sourcing, and franchising.[277] The parties did not

---

[269] JX0546 at 1.

[270] JX0607.

[271] *Compare* JX0564, *with* JX0607.

[272] *See* JX0564; JX0607; *accord* Moreton Tr. 840:14–23.

[273] *See* JX0564 at 131; JX0607 at 145.

[274] *See* JX0564 at 141–152; JX0607 at 155–169.

[275] JX0564 at 154–158; JX0607 at 171–175.

[276] JX0607 at 229.

[277] *Id.*

quantify the amount of savings generated by these efforts.[278]  After this discussion,

Bell explained that JAB

> did some back-of-the-envelope math and got excited about it.  But since we had no discussion with anyone about it, and it was a short period of time, we didn't, quote/unquote, put it in the model, financially.  But I will tell you—you even heard it earlier—coffee was core to our strategy of doing this. It's just something that was difficult for us to quantify at the time we were doing diligence.[279]

JAB did not quantify any growth opportunity synergies either before or after diligence.[280]

Also on April 3, Panera countered JAB's draft merger agreement and proposed lowering the termination fee from 4.0% to 2.5% of the equity value of the transaction.[281]  In response to that counter, also on April 3, JAB communicated to Shaich a "best and final" offer of $315.00 per share and a 3.0% termination fee.[282] The $315.00 offer represented a 34.1% premium from the March 10 trading price of $234.91 and a 20.3% premium from the March 31 pre-public speculation trading

---

[278] *See id.*

[279] *See* Bell Tr. 1129:2–24.

[280] *See* JX0400 at 43; JX0593 at 64.

[281] PTO ¶ 160.

[282] *Id.* ¶ 161.

41

price of $261.87.[283] JAB informed Panera that this offer would expire when the United States market opened on April 5.[284]

### J. Morgan Stanley Offers Its Fairness Opinion, And Panera Approves The Deal.

At 9:00 p.m. on April 3, Morgan Stanley's fairness committee met to discuss the proposed transaction between Panera and JAB, and found that the $315.00 per share offer exceeded the historical trading range, analyst price targets, public trading benchmarks, and the street discounted equity value analysis.[285] The analysis also showed that the $315.00 per share offer fell within the range of precedent transactions, management discounted equity value analysis, and both the street and management discounted cash flow analyses.[286] The committee prepared to present these findings to the board the next day.

On April 4 at 9:30 a.m., the board held a meeting to discuss JAB's "last and final" offer.[287] Shaich, Bufano, and Hurst presented highlights from the "Five-Year Strategic Plan & Financial Model" previously shared with JAB leaders.[288] During

---

[283] JX0631 at 6.

[284] PTO ¶ 161.

[285] *See* JX0627 at 20.

[286] *See id.*

[287] PTO ¶ 163.

[288] *Id.*; JX0608; JX0628 at 1; JX0629.

this meeting, management also reviewed the Company's full Five-Year Financial Model with the board.[289]

Morgan Stanley presented its fairness committee's findings.[290] The analysis included the evolution of merger discussions; a summary of JAB proposals with implied transaction multiples; a JAB company and precedent transaction overview; Panera's historical stock performance, next-twelve-month multiple measurements, and valuation comparables; and analyst perspectives on Panera.[291]

Morgan Stanley also presented its preliminary standalone valuation summary from both a street case and an internal management case based on the Five-Year Model.[292] The discounted cash flow analysis for the street case ranged from $231.00 to $318.00 per share, while the management case ranged from $300.00 to $410.00 per share.[293] The board discussed these valuations at length and asked Morgan Stanley questions about the underlying assumptions.[294] Morgan Stanley explained that the management case reflected assumptions for Panera's various initiatives and that "all those initiatives had to go right in order to achieve this management case

---

[289] PTO ¶ 164; JX0629; JX0616; *accord* Moreton Tr. 840:4–20.

[290] *See* PTO ¶ 165; JX0631.

[291] JX0631 at 1–14.

[292] *Id.* at 15–20.

[293] *Id.* at 19.

[294] JX0628 at 2; Moreton Tr. 843:14–845:3.

and then . . . there was execution risks in executing or in getting all those initiatives to the point that management was assuming within their management case."[295] While Morgan Stanley highlighted the effect of these assumptions, it accepted management's data in creating the management case and did not test it for reasonableness.[296] Morgan Stanley concluded that the merger consideration of $315.00 per share "was fair to and in the best interests of, from a financial point of view, the Company's shareholders and that it would be prepared to issue an opinion to the Company and its Board to that effect."[297]

After the board discussed their perspectives on the proposed transaction and the valuation of the Company, "[t]he directors expressed their strong support for the proposed transaction, noting particularly that the price was fair for the Company's

---

[295] Kwak Tr. 1236:18–1237:10. Kwak explained:

> A few considerations:
>
> You've got to believe that 80+% of your value is in the terminus
>
> Everything has got to go right; there is always risk of execution which may not be captured by our calculated WACC
>
> All initiatives are proven strategies, but not all are proven on a large scale
>
> Restaurant space is competitive – our guys are ahead of the pack now in terms of technology, for instance, but it's a r[i]sk that others are striving to catch up[.]

JX0625 at 3–4.

[296] Kwak Tr. 1221:2–11, 1235:17–1236:8, 1240:11–13.

[297] JX0628 at 2.

shareholders and that the deal protection mechanisms in the merger agreement were not preclusive to an alternative proposal for the Company's shares."[298]  The board then recessed and reconvened at 4:00 p.m. for the final review of the proposed transaction.[299]

At that time, Sullivan & Cromwell updated the board about the merger agreement, the voting agreement, and the non-competition agreement.[300]  Boublik orally delivered Morgan Stanley's fairness opinion (confirmed the next day in writing)[301] that the merger was fair from a financial point of view to Panera and its stockholders.[302]  The board unanimously approved the proposed resolutions to adopt, execute, and deliver the merger agreement.[303]

On April 5, Panera and JAB issued a joint press release announcing the merger.[304]

---

[298] *Id.* at 3.

[299] *Id.*

[300] PTO ¶ 167; JX0630 at 1.

[301] JX0647.

[302] PTO ¶ 167; JX0628 at 2.

[303] PTO ¶ 167; JX0630 at 2.

[304] PTO ¶ 170; *accord* JX0655.

## K. Panera Solicits And Obtains Stockholder Approval.

On May 12, Panera filed a preliminary proxy statement on Schedule 14A recommending that Panera's stockholders vote in favor of the merger.[305] On June 1, Panera issued a definitive Schedule 14A proxy statement, by which Panera notified all stockholders of their appraisal rights for their shares of Panera common stock pursuant to 8 *Del. C.* § 262, and attached a copy of 8 *Del. C.* § 262 as Annex C to the proxy.[306] On June 16, Panera issued supplemental disclosures.[307] On July 11, Panera stockholders approved the merger at a special meeting, at which over 97% of votes cast favored the merger, representing 80.26% of the outstanding shares.[308]

The merger closed on July 18.[309] No potential bidders emerged at any time, including after Bloomberg's March 27 request for comment or after the parties announced the deal on April 5.[310] As of the merger date, Panera operated 910 company-owned bakery-cafes and 1,132 franchisee bakery-cafes across 46 states, the District of Columbia, and Ontario, Canada.[311]

---

[305] PTO ¶ 2.

[306] *Id.* ¶ 3.

[307] *Id.* ¶ 4.

[308] *Id.* ¶¶ 5-6; JX0842 at 3.

[309] PTO ¶ 7.

[310] Kwak Tr. 1215:24–1218:2; Moreton Tr. 842:22–843:2.

[311] PTO ¶ 89.

On November 8, Panera announced that effective January 1, 2018, Shaich would step down as Chief Executive Officer of Panera and remain with the Company as Executive Chairman, and Hurst would succeed Shaich as Chief Executive Officer.[312]

### L. Dissenting Stockholders Seek Appraisal.

In early July 2017, thirty Dissenting Stockholders notified Panera of their desire to exercise their appraisal rights pursuant to 8 *Del. C.* § 262 over a collective 1,863,578 shares of Panera common stock.[313] The Dissenting Stockholders did not withdraw their demands within sixty days of the effective date of the merger.[314]

Between August 16, 2017 and September 13, 2017, Dissenting Stockholders filed five separate petitions seeking appraisal relating to the merger. The Court consolidated those petitions into this action.[315]

Between December 19, 2017 and May 10, 2018, Panera prepaid twenty-nine of the Dissenting Stockholders the full amount of the merger consideration, $315.00,

---

[312] *Id.* ¶ 180.

[313] *Id.* ¶ 9.

[314] *Id.* ¶ 10.

[315] *Id.* ¶ 11.

and statutory interest accrued through the payment date, for each share of Panera common stock beneficially owned.[316]

Certain Dissenting Stockholders withdrew their demands, and Panera and these Dissenting Stockholders jointly stipulated to dismiss their petitioners from this action.[317]

The Court held a six-day trial between April 1 and April 8, 2019. Post-trial briefing was completed on August 1.[318] The Court ordered supplemental briefing on August 22,[319] which the parties completed on September 27.[320] The Court held post-trial argument on October 7.[321]

## II. ANALYSIS

Petitioners contend that the fair value of their shares is $361.00.[322] Petitioners support this valuation with a three-pronged approach. They give no weight to deal price.[323] Instead, they give 60% weight to a discounted cash flow model prepared

---

[316] *Id.* ¶ 13.

[317] *See id.* ¶¶ 14–19.

[318] *See* D.I. 134.

[319] D.I. 142.

[320] *See* D.I. 144.

[321] *See* D.I. 154.

[322] JX0983 at 10.

[323] *Id.*; *accord* Shaked Tr. 394:10–12.

by their expert, Israel Shaked, professor of finance and economics at Boston University's Questrom School of Business.[324]  Petitioners attribute 30% of their valuation to Shaked's comparable companies analysis, and 10% to his precedent transaction analysis.

Throughout this proceeding, including at trial, Respondent pursued a valuation of $304.44.[325]  Respondent argued that deal price minus synergies deserves dispositive weight.  Respondent's expert was Glenn Hubbard, the Dean and Russell L. Carson Professor in finance and economics at the Graduate School of Business of Columbia University, as well as professor of economics at Columbia University.[326]  Seizing on Bell's trial testimony regarding revenue synergies, Respondent lowered its valuation to $293.44 in post-trial briefing.  Respondent seeks a refund of any difference between its prepayment at $315.00 per share and fair value.

## A. Legal Standard

"An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings."[327]  "Section 262(h) unambiguously calls upon the Court of Chancery

---

[324] JX0983 at 6.

[325] *See* JX0982 at 55–56; *accord* Hubbard Tr. 1479:23–1480:6.

[326] JX0982 at 5.

[327] *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988).

to perform an independent evaluation of 'fair value' at the time of a transaction . . . [and] vests the Chancellor and Vice Chancellors with significant discretion to consider 'all relevant factors' and determine the going concern value of the underlying company."[328] The determination of fair value is intended to ensure the stockholder is "paid for that which has been taken from him, *viz.*, his proportionate interest in a going concern."[329] Valuation of the corporation as a going concern must be "based upon the operative reality of the company as of the time of the merger, taking into account its particular market position in light of future prospects."[330] "Given that '[e]very company is different; every merger is different,' the appraisal endeavor is 'by design, a flexible process.'"[331]

"In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of [the] evidence."[332] In

---

[328] *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 364 (Del. 2017) (quoting *Golden Telecom, Inc. v. Glob. GT LP*, 11 A.3d 214, 217–18 (Del. 2010)); *accord* 8 *Del. C.* § 262(h).

[329] *Tri-Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950); *accord Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 132–133 (Del. 2019).

[330] *In re Appraisal of Stillwater Min. Co.*, 2019 WL 3943851, at *19 (Del. Ch. Aug. 21, 2019) (internal quotation marks omitted) (quoting *M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 525 (Del. 1999)), *judgment entered* 2019 WL 4750400 (Del. Ch. Sept. 27, 2019).

[331] *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 21 (Del. 2017) (footnote omitted) (quoting *In re Appraisal of PetSmart*, 2017 WL 2303599, at *26 (Del. Ch. May, 26, 2017), and then quoting *Golden Telecom*, 11 A.3d at 218).

[332] *M.G. Bancorp.*, 737 A.2d at 520.

evaluating the parties' positions, "[n]o presumption, favorable or unfavorable, attaches to either side's valuation,"[333] and "[e]ach party also bears the burden of proving the constituent elements of its valuation position . . . , including the propriety of a particular method, modification, discount, or premium."[334] Because the Court determines fair value based on an adversarial presentation blending facts, opinions, and argument, the Court's conclusions in one appraisal proceeding may not squarely inform its conclusions in another.[335]

The appraisal exercise occurs in the context of the efficient market hypothesis, "long endorsed" by the Delaware Supreme Court.[336] "It teaches that the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client."[337] In view of this principle, the Delaware Supreme Court has acknowledged "the economic reality that

[333] *Pinson v. Campbell-Taggart, Inc.*, 1989 WL 17438, at *6 (Del. Ch. Feb. 28, 1989).

[334] *Stillwater*, 2019 WL 3943851, at *18 (quoting Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, Corp. Prac. Series (BNA) No. 38-5th, at A-90 (2010 & 2017 Supp.)).

[335] *See In re Appraisal of Jarden Corp.*, 2019 WL 3244085, at *1 (Del. Ch. July 19, 2019), *reargument granted in part, denied in part*, 2019 WL 4464636 (Del. Ch. Sept. 16, 2019). *Merion Capital L.P. v. Lender Processing Servs., L.P.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016); *Glob. GT LP v. Golden Telecom, Inc.*, (*Golden Telecom Trial*), 993 A.2d 497, 517 (Del. Ch.), *aff'd*, 11 A.3d 214 (Del. 2010);

[336] *Dell*, 177 A.3d at 24.

[337] *Id.*

the sale value resulting from a robust market check will often be the most reliable evidence of fair value, and . . . second-guessing the value arrived upon by the collective views of many sophisticated parties with a real stake in the matter is hazardous."[338] At the same time, the Delaware Supreme Court does not view "the market [a]s always the best indicator of value, or that it should always be granted some weight."[339] "There is no presumption that the deal price reflects fair value."[340] "[T]he persuasiveness of the deal price depends on the reliability of the sale process that generated it."[341] If the sale process is not open or sufficiently reliable, "the deal price should not be regarded as persuasive evidence of fair value."[342]

---

[338] *DFC*, 172 A.3d at 366.

[339] *Dell*, 117 A.3d at 35.

[340] *Stillwater*, 2019 WL 3943851, at *21 (citing *Dell*, 177 A.3d at 21; *DFC*, 172 A.3d at 366–67).

[341] *Id.*

[342] *Id.* at *22; *accord Aruba*, 210 A.3d at 137 ("[A] buyer in possession of material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller when agreeing to buy the company at a particular deal price, and that view of value should be given considerable weight by the Court of Chancery absent deficiencies in the deal process."); *Jarden*, 2019 WL 3244085, at *23 ("This court has heeded the Supreme Court's guidance and regularly rests its appraisal analysis on the premise that when a transaction price represents an unhindered, informed and competitive market valuation, that price 'is at least first among equals of valuation methodologies in deciding fair value.'" (quoting *In re Appraisal of AOL Inc.*, 2018 WL 1037450, at *1 (Del. Ch. Feb. 23, 2018))).

There is no checklist or set of minimum characteristics for giving weight to the deal price.[343] Indeed, Delaware Supreme Court precedent announced in "*Aruba*, *Dell*, and *DFC* do[es] not establish legal requirements for a sale process."[344] A deal price serves as a persuasive indicator of fair value where the sale process bears "objective indicia of fairness that rendered the deal price a reliable indicator of fair value."[345] Vice Chancellor Glasscock described a "*Dell* compliant" process as one "where (i) information was sufficiently disseminated to potential bidders, so that (ii) an informed sale could take place, (iii) without undue impediments imposed by the deal structure itself."[346] In *Stillwater*, Vice Chancellor Laster recited several objective indicia of reliability approved by the Delaware Supreme Court: negotiations "[at] arm's-length";[347] board deliberations without "any conflicts of interest";[348] buyer "due diligence and recei[pt of] confidential information about [the

---

[343] *See Stillwater*, 2019 WL 3943851, at *21.

[344] *Id.* at *22.

[345] *Id.* at *44.

[346] *AOL*, 2018 WL 1037450, at *8.

[347] *Stillwater*, 2019 WL 3943851, at *22 (citing *DFC*, 172 A.3d at 349).

[348] *Id.*; *see also DFC*, 172 A.3d at 375–76.

53

company's] value";[349] and seller "extract[ion of] multiple price increases."[350] The Delaware Supreme Court has particularly stressed the absence of post-signing bidders as an objective indicator that the sale process was reliable and probative of fair value.[351]

The presence of objective indicia of reliability does not establish a presumption in favor of the deal price.[352] Where these indicia are present, I must determine whether they outweigh weaknesses in the sale process, or whether those weaknesses undermine the persuasiveness of the deal price.[353]

---

[349] *Stillwater*, 2019 WL 3943851, at *23 (citing *Aruba*, 210 A.3d at 137–38); *see also Dell*, 177 A.3d at 30 (review of "the Company's confidential information"); *DFC*, 172 A.3d at 355–56 (same).

[350] *Stillwater*, 2019 WL 3943851, at *23 (citing *Aruba*, 210 A.3d at 139; *Dell*, 177 A.3d at 28).

[351] *Id.* (citing *Aruba*, 210 A.3d at 136 ("It cannot be that an open chance for buyers to bid signals a market failure simply because buyers do not believe the asset on sale is sufficiently valuable for them to engage in a bidding contest against each other."); *Dell*, 177 A.3d at 29 ("Fair value entails at minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay."); *id.* at 33 (finding that absence of higher bid meant "that the deal market was already robust and that a topping bid involved a serious risk of overpayment," which "suggests the price is already at a level that is fair")).

[352] *Id.* at *22.

[353] *Cf. id.* (synthesizing the three recent Supreme Court appraisal decisions in *Aruba*, *Dell*, and *DFC*).

### B. Panera's Sale Process Was Sufficiently Reliable To Make Deal Price Persuasive Evidence Of Fair Value.

I find several objective indicia of reliability in this case. As a prefatory matter, Panera's stock traded in an efficient market, such that indicia of reliability in Panera's sale process support giving weight to deal price.[354] First, as Petitioners' process expert James Redpath recognized, the parties negotiated in an arm's-length

---

[354] This point does not appear to be in serious dispute. Petitioners' opening post-trial brief did not assert that Panera's stock did not trade in an efficient market. The parties discussed the efficiency of the market for Panera's stock only while talking past each other about whether weight should be given to Panera's stock price. *Compare* D.I. 138 at 60–65, *and* D.I. 141 at 23, *with* D.I. 140 at 40–46. Out of an abundance of caution, I make the unsurprising finding that Panera "ha[d] many stockholders; no controlling stockholder; 'highly active trading'; and . . . information about the company [was] widely available and easily disseminated to the market." *See Dell*, 177 A.3d at 25 (citation omitted). Panera also had a large market capitalization, substantial public float and trading volume, a low bid-ask spread, a high number of equity analysts, and a rapid response to transaction rumors. *See id.* at 7, 25. Hubbard's report on these factors was persuasive and supported by evidence presented at trial. JX0982 at 58–61; Hubbard Tr. 1504:11–1505:14, 1506:11–24. In my view, these straightforward factors are plainly present and provide conclusive evidence of an efficient market for Panera's stock. This conclusion is undisturbed by Shaked's analyses of market reactions to Panera news, which I find to be plagued by subjectivity in what is "new and material" information, and a failure to account for trading volume. *See* JX0988 at 83–84, 90–92.

transaction.[355]  Redpath similarly conceded that the board was independent, and labored without conflicts of interest.[356]

Second, JAB assessed Panera's value using both Panera's extensive public information and focused due diligence into Panera's confidential information.[357]  In *DFC*, deal price was the best evidence of fair value in part because it was "informed by robust public information[] and easy access to deeper, non-public information."[358]  Bell found Panera's "transparency [was] off the charts[,]"and JAB's legal advisors shared the view that "much of [JAB's diligence] is check the box and that they have reviewed everything that is public."[359]  Shaich explained that he presented the Five-Year Strategic Plan "hundreds of times" to "internal groups,

---

[355] Redpath Tr. 635:6–9.  Redpath is a senior investment banking partner at Cypress Associates, a "nationally recognized investment banking firm."  *See id.* 499:9–14, 505:18–21.

[356] *Id.* 635:24–638:9, 643:12–644:8.  Petitioners claim a special committee was necessary here, but Petitioners cannot point to a conflict that a special committee could remedy where Panera had seven independent board members on its nine-member board.

[357] JX0476 at 2; JX0583 at 1.

[358] 172 A.3d at 349.

[359] JX0461 at 1; JX0581; *accord* JX0476 at 2 ("Remember, this is a very clean public company, so have to tone down the voluminous generic requests . . . .").

external groups" and "every investment conference" he attended ("twenty a year") "to get everybody to understand [] what's the vision and where we were."[360]

In addition, JAB received and reviewed the specific nonpublic information that Shaich believed would lead JAB to see greater value in Panera.[361] After reviewing that information, JAB internally raised their offer from $296.50 to $305.00, as the information confirmed a "[s]ignificant [c]ash [o]pportunity" through working capital and other cost savings.[362] Ultimately, JAB offered Panera $315.00.[363] Although JAB limited their access to non-public information, they did so as a natural result of Panera's widespread public dissemination of meaningful information.

Third, Panera used Boublik's guidance[364] and Shaich's doggedness to extract two price increases.[365] Even operating under their own preferred terms of

---

[360] Shaich Tr. 921:7–9, 948:2–18, 960:8–961:3, 962:17–23; *see, e.g.*, JX0194 at 1; JX0192 at 5, 11; JX2028 at 3, 17; JX0032 at 51; JX0041 at 5, 22; JX0064 at 2; JX0260 at 4–5, 15; JX0331 at 3–4; JX0345 at 4–5, 14; JX0029; JX1039; JX0063 at 3; JX0304.

[361] JX0490; *accord* Moreton Tr. 840:7–23.

[362] JX0593 at 49–50. These findings are discussed further in Section II(D), *infra*.

[363] PTO ¶ 161.

[364] Kwak Tr. 1206:15–1207:6; *accord* Moreton Tr. 821:7–14 ("Q. Did Panera at any time in the negotiations give a, quote, unquote, counteroffer in the sense of a specific price point at which it would agree to a deal? A. No. We never did. This was part of the strategy that Morgan Stanley helped craft, that there was no reason to do that. At this point, it was just a push for more.").

[365] Shaich Tr. 999:9–1002:4.

engagement, JAB raised their price twice. The board rejected JAB's initial $286.00 offer, communicating its expectation that JAB would find more value for the Company during the diligence process.[366] Boublik agreed and encouraged Shaich, the lead negotiator, and Moreton, a board negotiation advisor, to seek additional value.[367] When JAB revised their offer to $296.50, JAB also explained that they would not raise the offer a penny over $299.00.[368] This was still too low for the board.[369] Shaich and Moreton listened to Morgan Stanley's guidance and believed the Company could break JAB's stated ceiling price without giving a counteroffer.[370] Morgan Stanley was right. After conducting diligence, confirming its anticipated cost savings, and reviewing the Five-Year Strategic Plan and Five-Year Model, JAB raised its price to $315.00.[371]

---

[366] PTO ¶¶ 139, 141; JX0448 at 1; *accord* Moreton Tr. 822:1–8 ("JAB's transactions had gone from the initial discussions and initial bids, through due diligence, to the end, and how they had a history of raising their offer price as they went through.").

[367] Moreton Tr. 820:4–13; *accord* JX0519 at 1.

[368] PTO ¶ 140; *accord* Shaich Tr. 1002:9–23; JX0483.

[369] PTO ¶ 141 ("The Board supported moving forward with further discussions and due diligence but again expressed its expectation that any final offering price be significantly higher.").

[370] *See* Moreton Tr. 821:7–822:8.

[371] PTO ¶ 161.

Fourth, no other potential bidders emerged, despite a leak during negotiations and nonpreclusive deal protections.[372] A leak gives potential bidders notice of the transaction and an opportunity to bid.[373] According to Kwak, leaks typically happen at the tail end of a process,[374] and a potentially interested buyer with the capacity to acquire a $7 billion company would "have the experience and the know-how and the team members to know that you do need to move swiftly because at any point they could sign a transaction with the rumored buyer."[375] Kwak explained that when a rumored transaction surfaces, coverage bankers immediately identify and contact potential buyers "to explore whether th[ose] compan[ies] ha[ve] interest in pursuing an acquisition."[376]

The first evidence of a leak emerged on March 27, when Bloomberg called JAB for a comment. The leak concerned Bell greatly, evidencing that JAB feared

---

[372] *Id.* ¶¶ 148, 159; Kwak Tr. 1215:24–1218:2.

[373] *In re Appraisal of Solera Hldgs., Inc.*, 2018 WL 3625644, at *14 (Del. Ch. July 30, 2018) (analyzing *Dell* and commenting that "[g]iven leaks in the press that Dell was exploring a sale . . . the world was put on notice of the possibility of a transaction so that any interested parties would have approached the Company before the go-shop if serious about pursuing a deal." (internal quotation marks omitted)); *cf. DFC*, 172 A.3d at 376 (identifying "the failure of other buyers to pursue the company when they had a free chance to do so" as an objective indicator of fairness supporting deal price).

[374] Kwak Tr. 1216:11–1217:16.

[375] *Id.* 1216:11–23.

[376] *Id.* 1216:24–1217:16.

another bidder might surface. The transaction became public on April 3, when Bloomberg published its article.[377] No bidders surfaced.

Further, no third-party bidders expressed interest or submitted a bid during the three-month post-signing period after the parties announced the deal.[378] Panera's deal protections included a no-shop provision with a fiduciary out, matching rights, a 3% termination fee, and 104 days between signing and closing.[379] Morgan Stanley considered each post-signing protection to be customary or insufficiently preclusive to post-signing bidders.[380] Kwak viewed a 3 to 4% break-up fee as "typical" and 3% as "customary,"[381] and recognized that even "customary" matching rights "may discourage in a way and make it more challenging" for other bidders to come forward, but such rights would not prevent them.[382] Kwak testified at trial that an interested bidder "could contact and put forth an offer to the company."[383] Kwak

---

[377] JX0609.

[378] Kwak Tr. 1242:11–1243:3. In Kwak's view, the leak gave interested bidders sufficient time to come forward before signing. *Id.* 1242:11–23. Redpath agreed. JX0985 at 76 ("There was sufficient time for a topping bidder to emerge post-signing.").

[379] PTO ¶¶ 132, 161; JX0789 at 71–75, 79–81; *see also* JX0772 at 97–100, 106–107.

[380] *See, e.g.*, Kwak Tr. 1240:14–21, 1241:10–24.

[381] *Id.* 1241:10–15.

[382] *Id.* 1241:16–24.

[383] *Id.* 1241:5–9.

60

concluded there was sufficient time between signing and closing, noting, "[I]f there was someone, we would have expected to at least get some form of an inbound."[384]

Petitioners have not meaningfully challenged the terms Panera's post-signing passive market check, or offered any evidence that an interested bidder did not have a reasonable chance to bid.[385] To the contrary, Redpath conceded, "[t]here was

---

[384] *Id.* 1242:11–23.

[385] This Court has recently posited that deal price is persuasive evidence of fair value, even with a limited pre-signing outreach, if the merger agreement's deal protections are sufficiently open to permit a post-signing passive market check in line with what decisions have held is sufficient to satisfy enhanced scrutiny. *Stillwater*, 2019 WL 3943851, at *24–30. As *Stillwater*'s holdings have been appealed to the Delaware Supreme Court, I limit my holding today to the unremarkable conclusion that no bidders emerged in the face of nonpreclusive deal protections. But with the aid of the parties' briefing on the issue, it seems to me that Panera's post-signing market check would survive enhanced scrutiny and therefore under *Stillwater*, would support deal price as fair value. For example, in *C & J Energy*, the parties bargained for a suite of deal protections, including a no-shop clause subject to a fiduciary out, a 2.27% termination fee, and a post-signing passive market check lasting 153 days. *See C & J Energy Servs., Inc. v. City of Miami Gen. Emps.*, 107 A.3d 1049, 1063 (Del. 2014). The Delaware Supreme Court explained that under this suite, "a potential competing bidder faced only modest deal protection barriers," *id.* at 1052, and "there were no material barriers that would have prevented a rival bidder from making a superior offer," *id.* at 1070. In support, the Delaware Supreme Court approvingly cited *In re Dollar Thrifty Shareholder Litigation*, 14 A.3d 573, 612–13, 615 (Del. Ch. 2010). In *Dollar Thrifty*, this Court found the board used reasonable judgment to deal exclusively with the buyer without conducting a pre-signing market check where deal protections included a no-shop provision with a fiduciary out, matching rights, a 3.9% termination fee, and a passive post-signing market check lasting 126 days. *Id.* at 592–93, 614–16. And in *In re PLX Technology Inc. Stockholders Litigation*, the Delaware Supreme Court affirmed this Court's damages ruling where the trial court determined damages based on a quasi-appraisal theory that the company should have remained a standalone company. 211 A.3d 137 (Del. 2019) (TABLE), *aff'g In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535 (Del. Ch. Oct. 16, 2018). At trial, this Court found that the sale process as a whole was sufficiently reliable to reject a DCF methodology where the process included a fifty-day passive, post-signing market check with a suite of deal protections, including a no-shop with a fiduciary out, unlimited matching rights, and a 3.5% termination fee. *PLX*, 2018

sufficient time for a topping bidder to emerge post-signing."[386] After the leak and the public deal announcement, other market participants "failed to pursue a merger when they had a free chance to do so."[387] "The failure of any other party to come forward provides significant evidence of fairness, because '[f]air value entails at minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay.'"[388]

In particular, none of the "big three"[389] potential bidders that Morgan Stanley identified—Starbucks, Chipotle, and RBI—showed any interest in bidding for Panera, both before and after the parties announced the deal. Chipotle knew about the leak before the deal signed, but did not express interest before or after signing.[390]

---

WL 5018535 at *2, *26–27, *44, *55. Panera's deal protections differ little from those in *C & J Energy*, *Dollar Thrifty*, and *PLX*. Panera's 3.0% termination fee falls on the low end of the range presented by these deals. As for the time between announcement and closing or injunction, Panera's falls in the middle. Each deal contained a no-shop provision with a fiduciary out, and *Dollar Thrifty* and *PLX* included matching rights. Panera's deal protections fall within what Delaware courts have held to satisfy enhanced scrutiny.

[386] JX0985 at 76.

[387] *DFC*, 172 A.3d at 376; *accord Stillwater*, 2019 WL 3943851, at *35.

[388] *Stillwater*, 2019 WL 3943851, at *42 (quoting *Dell*, 177 A.3d at 29); *see also Dell*, 177 A.3d at 32–34; *Aruba*, 210 A.3d at 136.

[389] Shaich Tr. 1019:18–1020:13.

[390] *See* JX0700 at 2.

Both RBI and Chipotle sent post-announcement congratulatory messages to Morgan Stanley after the parties announced the deal.[391]

Finally, Panera solicited all logical buyers consistent with its knowledge of the Company's value and the market. The Delaware Supreme Court has identified "outreach to all logical buyers" as a key indicator of reliability.[392] Petitioners contend that Panera engaged in a closed, single-bidder strategy during the pre-signing process. Respondent asserts that Panera engaged "all logical buyers."[393]

In *Dell*, the board similarly limited its pre-signing canvass to two bidders, based on its financial advisor's recommendation that those two firms were "among the best qualified potential acquirers" and that "there was a low probability of strategic buyer interest in acquiring the company."[394] The *Dell* board also conducted a go-shop, soliciting interest from sixty-seven potential bidders.[395] As a result, the

---

[391] *See id.*; JX0654 at 1–2. The other referenced potential bidder in the Bloomberg article, Domino's, expressed that it was not interested and was not "having any conversations regarding the purchase of Panera" because it has "a lot more opportunity for growth in pizza." JX0609 at 2, 4.

[392] *Dell*, 117 A.3d at 35.

[393] *Id.*

[394] *Id.* at 9 (quoting *In re Appraisal of Dell*, 2016 WL 3186538, at *6 (Del. Ch. May 31, 2016), *aff'd in part, rev'd in part sub nom. Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1 (Del. 2017)).

[395] *Id.* at 12.

Supreme Court determined the deal price "deserved heavy, if not dispositive, weight."[396]

Panera led outreach to all logical buyers: Starbucks and JAB. The negotiations with the two companies followed the same pattern. Shaich asserted Panera's value based on the Five-Year Strategic Plan to "sell[]" the company, or solicit interest,[397] listened to gauge interest, and then consulted with the board.[398] The failed negation with Starbucks prepared Shaich and the board to negotiate with JAB.

As a recap, in June 2015, Goldman identified several potential strategic bidders, and identified Starbucks as Panera's most likely buyer.[399] Starbucks was the most likely bidder because Panera was "such a valued company" "trading at very high multiples."[400] Goldman concluded a financial buyer was unlikely, and the board understood that financial sponsors were limited and none could afford the Company.[401] With that analysis, the board decided that it should remain an

---

[396] *Id.* at 23.

[397] *Compare* Shaich Tr. 970:14–21; 971:20–973:3, *with id.* 978:8–979:18; *accord* Bell. Tr. 1147:11–1148:8.

[398] *Compare* Shaich Tr. 968:9–969:5, *with id.* 980:8–981:4, 983:7–984:13.

[399] JX0019 at 18; Shaich Tr. 955:7–956:3, 958:1–19; *accord* Moreton Tr. 770:22–771:19.

[400] Shaich Tr. 955:18–23; *accord* Moreton Tr. 770:22–771:19.

[401] Shaich Tr. 956:14–957:7.

independent company, but that "the Company would, as it had done in the past, continue to observe the markets and consider activities in the best interest of shareholders on an ongoing basis."[402]

About a year later, in July 2016, Starbucks initiated a possible collaboration[403] and the board instructed Shaich to solicit Starbucks' interest in an acquisition.[404] In August 2016, Shaich started the conversation with JAB, another potential buyer that was conducting acquisitions at "huge multiples."[405] Shaich explained:

> I saw an article in Nation's Restaurant News, I think [JAB] had just done an acquisition. They were buying companies every six months at huge multiples. And I thought they were at least worth getting to know in some way, so I picked up the phone and called Goldman, said do you know these guys and can you introduce me. That was August.[406]

After August, Panera continued its negotiations with Starbucks, which concluded by December 2016.[407] JAB expressed interest in meeting with Shaich, but with another

---

[402] JX0019 at 2; *accord* JX0022 at 3–4 (Goldman's November 4, 2015 board presentation confirming the board's decision to remain a standalone company due to the broader market trends).

[403] *See* JX0110; JX0118; JX0772 at 56.

[404] JX0125 at 4; Moreton Tr. 795:10–796:17.

[405] Shaich Tr. 976:11–23.

[406] *Id.*

[407] *Id.* 975:15–24; Moreton Tr. 798:23–799:10.

ongoing acquisition, JAB did not engage with Shaich until February 2017.[408]  After JAB expressed interest in acquiring Panera on March 24, Shaich probed Goldman for more information about the acquisition landscape, especially after RBI announced its acquisition of Popeyes on February 21.[409]  Goldman replied, "Best buyer today is a JAB, with a long term perspective that counters near term valuation trends.  Or Starbucks.  Or a merger with someone like Chipotle."[410]  Shaich shared Goldman's analysis with Colasacco.[411]

As conversations with JAB proceeded, Morgan Stanley identified the same four strategic primary strategic buyers as Goldman:  JAB, Starbucks, Chipotle, and RBI.[412]  Morgan Stanley also excluded other potential acquirers.  Morgan Stanley recognized that Dunkin and Dominos were highly leveraged like RBI and all three would have difficulty paying all cash.[413]  Beyond this, Morgan Stanley recommended that Dunkin and Dominos also had "slightly different business

---

[408] Shaich Tr. 976:24–977:6; *accord* JX0318; JX0334.

[409] JX0399 at 1–2.

[410] *Id.*.

[411] *Id.* at 1.

[412] JX0625 at 4; JX0631 at 23.  The companies that Petitioners cite as potential buyers were identified by Morgan Stanley and passed over because of fit or limitations.  *See* JX0631 at 23–24; JX0625 at 4.

[413] *See* JX0625 at 4.

models" and lacked a clear strategic fit.[414]  With this guidance from both Goldman and Morgan Stanley, the board viewed JAB as the only remaining logical bidder. Like Goldman, Morgan Stanley viewed Starbucks as the only other potential buyer that could afford Panera,[415] but the board had already exhausted that option.[416]  The board knew that Chipotle was recovering from a food safety crisis and otherwise focused on share buybacks.[417]  And the board knew that RBI had agreed to acquire Popeyes.[418]  The board concluded that no other bidders were out there.[419]  Morgan Stanley confirmed the board's conclusion:  "JAB represents the buyer with the most interest, wherewithal, and ability to pay and would be a good fit."[420]  Moreton

[414] *Id.*

[415] JX0631 at 23; *accord* Kwak Tr. 1226:21–1227:12.

[416] Shaich Tr. 974:11–22, 975:23–976:10, 1019:18–1020:5; *accord* JX0625 at 4 ("There were conversations with Starbucks last year, they ultimately declined to proceed citing that Panera was trading too richly (and it has since only traded up)."); JX0772 at 56; Moreton Tr. 798:23–799:10.

[417] Shaich Tr. 1020:6–9; JX0631 at 23.

[418] *See* JX0631 at 23.

[419] Moreton Tr. 811:19–812:17 ("[T]here was nobody else out there talking to [the board] about potentially acquiring [the Company], nor did [the board] think there would be."); *see also id.* 912:7–11 ("[T]here was nobody else to reach out to . . . [w]e went through the process.").  Market analysts confirmed this conclusion after the Bloomberg leak:  "[W]e believe Starbucks is the only one with any real (even slight) probability.  We also note that JAB might be interested, given its acquisitions of Krispy Kreme, Einstein/Noah, Keurig, Caribou, and Peet's Coffee. . . . All-in, we suspect JAB would be the more likely suitor than Starbucks, as we believe a newly minted CEO and a relatively sizable acquisition would increase Starbucks' risk profile."  JX0609 at 12–13.

[420] JX0625 at 4.

summarized, "we had just gone through the key strategic buyer. Starbucks had told us no. And Morgan Stanley and Goldman had told us there were no financial bidders out there. So we really thought this was an opportunity to see if we could get a price that was reasonable for shareholders."[421] The leak added certainty to the board's conclusion.[422]

Petitioners argue that a logical buyer universe of only two buyers is "absurd" because "Panera could not have known buyers were 'out' without ever conducting a market check."[423] The Delaware Supreme Court has held that when "the directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market."[424] And "if a board fails to employ any traditional value maximization tool, such as an auction, a broad market check, or a go-shop provision, that board must possess an impeccable knowledge of the company's business for the Court to determine that it acted reasonably."[425]

---

[421] Moreton Tr. 824:3–12.

[422] JX0625 at 4 ("Since the leak yesterday, no one has come forward to express an interest.").

[423] D.I. 140 at 17.

[424] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1287 (Del. 1989).

[425] *In re OPENLANE, Inc. S'holders Litig.*, 2011 WL 4599662, at *5 (Del. Ch. Sept. 30, 2011).

I find that the board possessed a robust body of evidence that it used to determine the universe of logical buyers. The board's impeccable knowledge of the market in the pre-signing phase, and the lack of interested bidders in the post-signing phase, leads me to find that the board led outreach to all logical buyers. Because Panera engaged with Starbucks first, JAB's confidentiality requirement did not preclude the board's outreach to all logical buyers. The absence of a wider canvass or go-shop does not change the reliability of Panera's outreach.[426] This decision was confirmed when no other bidders came forward either after the leak or during the post-signing passive market check. The preponderance of the evidence shows that the board used its knowledge of the market and its advisors' advice to engage all logical buyers in a value-maximizing process.

Panera's deal process bears many indicia of reliability, including an arm's length negotiation, a disinterested and independent board, numerous price increases, no emerging bidders post-leak or post-announcement, and outreach to all logical buyers. The process also terminated with an open passive post-signing market

---

[426] Petitioners point to Morgan Stanley's label of "Potential Interlopers" in claiming that Panera should have contacted additional potential bidders. As explained herein, the preponderance of the evidence shows that Panera contacted all logical buyers. Morgan Stanley's label, which they later changed to "Potentially Interested Parties," does not disturb this result. *Compare* JX0552 at 14–15, *with* JX0631 at 23–24; *accord* Kwak Tr. 1237:11–20. And even if the use of the term "interlopers" signaled a fear of intruders, as explained herein, Morgan Stanley advised the board to negotiate for less restrictive deal terms, enabling another interested party to bid.

69

check.  I therefore turn to the weaknesses in the process to determine whether they undermine its reliability.

### C. Weaknesses In Panera's Process Do Not Undermine The Deal Price's Reliability.

Petitioners point to weaknesses in the pre-signing process that they believe undermine the deal price's reliability.  They focus on actions taken by the board, Shaich, and Morgan Stanley.  In all, I find that the transaction's flaws do not undermine its numerous indicia of reliability.

### 1. The board did not undermine the deal process.

Petitioners characterize the pre-signing phase as exhibiting the board's "apathy," ignorance, and "flat-footed[ness]."[427]  According to Petitioners, these traits manifested in the board's failures to 1) authorize Shaich's initial outreach to JAB, 2) oversee the negotiations, 3) negotiate with a proper valuation, 4) reject JAB's confidentiality and speed provisions, and 5) negotiate deal protections.

First, while the board had authorized Shaich to solicit Starbucks' interest in acquiring Panera,[428] Shaich did not obtain specific board authorization for his August 2016 outreach to JAB.  Shaich's independent outreach did not generate a response until early 2017.  At that time, when JAB offered to meet with Shaich,

---

[427] D.I. 139 at 20, 48.

[428] *See* JX0116; JX0122 at 1; JX0125 at 4; *accord* Moreton Tr. 794:8–795:13, 796:3–8.

Shaich informed Colasacco and other board members.[429] When JAB expressed an interest in acquiring Panera on February 24, 2017, Shaich informed Colasacco the next day,[430] and informed the board three business days later on March 1.[431] Thus, although Shaich initiated Panera's outreach to JAB, he timely and fully updated the board when JAB expressed interest in a transaction.[432] Shaich did not negotiate for a role post-merger or negotiate for change-in-control compensation.[433] Petitioners provided no evidence that the outreach alone—Shaich's only act that was not specifically authorized—led to any diminution in value or in the board's power to negotiate or decline a transaction with JAB.

Second, while Shaich initiated and led the negotiations, the board exercised active oversight. The board of directors "has the sole power to negotiate the terms

---

[429] *See* JX0338; Shaich Tr. 977:17–978:7; *accord* Moreton Tr. 803:7–11 ("Did any of the directors know about Mr. Shaich's discussions with JAB before the March 1st board meeting? A. Certainly, I did. I believe Domenic did, and perhaps Tom [Lynch] did.").

[430] *See* JX0287 at 9; *accord* Shaich Tr. 980:11–981:4.

[431] JX0408 at 3–4; *accord* Moreton Tr. 802:17–803:11. Moreton described Shaich's "typical way of communicating [as] concentric circles, first with [him], and then Domenic [Colasacco], our lead director, and Tom Lynch, and then the board as a whole." Moreton Tr. 794:2–7. Shaich testified about this procedure, and explained that on an unspecified date he informed the board that he used Goldman to reach out to JAB. *See* Shaich Tr. 1048:2–23. Shaich had followed this same pattern in the Starbucks negotiations. When Schultz proposed a collaboration with Panera on July 31, 2016, Shaich informed Moreton, Lynch, and Colasacco that evening, and informed the board two days later on August 2. *See* JX0118; JX0116; JX0122 at 1; JX0125 at 4; *accord* Moreton Tr. 793:14–795:13.

[432] JX0408; Shaich Tr. 983:7–984:13.

[433] JX0421 at 1; Bell Tr. 1109:17–1111:8.

71

on which the merger will take place and to arrive at a definitive merger agreement embodying its decisions as to those matters."[434] The preponderance of the evidence shows the board negotiated the terms of the merger and unanimously approved the final merger agreement.

A CEO's rogue negotiations can undermine a deal process. In *Jarden*, the CEO "immediately took charge and, consistent with a stereotypical 'cut to the chase' CEO mentality, he laid Jarden's cards on the table before the negotiations began in earnest and before the board and its financial advisors had a chance to formulate a plan."[435] Beyond this, the *Jarden* CEO failed to inform the board of the negotiations.[436] He also did not receive authorization from the board to suggest a price, make counteroffers, or negotiate his "change-in-control compensation," but did so anyway.[437] These facts contributed to the Court's finding that the merger price was not a reliable indicator of fair value.[438]

---

[434] Stephen M. Bainbridge, *Mergers and Acquisitions* 56 (2d ed. 2009) (citing 8 *Del. C.* § 251(b)); *accord* 8 *Del. C.* § 141 ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors . . . .").

[435] *Jarden*, 2019 WL 3244085, at *24 (footnote omitted).

[436] *Id.* at *9, *24.

[437] *Id.* at *24.

[438] *Id.* at *25.

I do not find similar troubling facts in this case. Unlike in *Jarden*, the board directed Shaich's negotiations, and Shaich observed the bounds of the board's authorization. Shaich informed the board of JAB's interest before JAB made an offer.[439] At that time, the board authorized Shaich to "continue the conversations with JAB and report back to the Board with an update as to the discussions and the status of any offer."[440] When JAB offered to acquire Panera on March 10, 2017, for $286.00 per share, Shaich formally informed the board on March 14.[441] The board instructed Shaich to move forward with the discussions,[442] but directed him to communicate to JAB that the board "would not agree to any proposed offer for the Company that was not significantly higher than the $286.00."[443]

The board also used Sullivan & Cromwell as its outside legal counsel for the potential transaction with JAB.[444] Sullivan & Cromwell advised the board during

---

[439] JX0408 at 3–4 (Shaich reported, "while no offer had been made during those discussions, Olivier Goudet, Chief Executive Officer of JAB, and David Bell, Head of M&A of JAB, indicated that JAB had internally discussed the potential for a transaction with the Company and JAB was considering making an offer to buy the Company"); *accord* Shaich Tr. 977:23–978:7.

[440] JX0408 at 4.

[441] PTO ¶ 134.

[442] JX0421 at 1–2.

[443] PTO ¶ 134.

[444] *Id.* ¶ 77.

its March 14 meeting and helped the board select financial advisors.[445] On March 15, the board initiated the process to retain Morgan Stanley as its financial advisor.[446] From then on, Shaich and Moreton worked with the board and Morgan Stanley to adopt a proven strategy to raise JAB's price through diligence.[447]

When JAB raised their offer to $296.50 per share on March 20,[448] Shaich informed the board that same day.[449] At the meeting, the board considered the offer, and "various directors asked questions and provided their thoughts and comments."[450] Shaich testified that "the board supported [him] in pushing" JAB to a higher price[451] and "expressed its expectation that any final offering price be significantly higher."[452]

Shaich conveyed that message to JAB and focused on generating additional value through the diligence process.[453] When JAB asked to move up the

---

[445] *Id.* ¶¶ 134–135; JX0466 at 2.

[446] PTO ¶ 137.

[447] JX0455, JX2019; Kwak Tr. 1206:15–1207:6, 1208:6–1209:9; Moreton Tr. 821:7–14, 821:15–822:8; Shaich Tr. 996:15–1000:11.

[448] PTO ¶ 140;

[449] *Id.* ¶¶ 140–41; *see* JX0448 at 1.

[450] *See* JX0448 at 1.

[451] Shaich Tr. 1004:14–18.

[452] PTO ¶ 141; JX0448 at 1.

[453] *See* JX0494 at 1; JX0491; JX0490; JX0519.

announcement by a week, Shaich discussed this proposal with Moreton, Bufano, and the Company's legal and financial advisors, and explained he did not find the compressed timeline material; he cared about JAB understanding Panera's value.[454] Accordingly, Shaich told JAB that "[w]e think we need to spend some more time with you so we can show you the prospects in our plan, in order to get you comfortable at a value that my board and I can support."[455] While Shaich led diligence meetings between Panera and JAB, the board counteroffered against JAB's 4.0% termination fee, proposing 2.5%.[456]

At the culmination of JAB's diligence, Shaich informed the board of JAB's final offer.[457] The board then reviewed the Five-Year Strategic Plan and Five-Year Model,[458] vetted the deal with Morgan Stanley,[459] and ultimately "expressed their strong support for the proposed transaction."[460] Later that same day, the board reconvened to discuss the proposed merger with Sullivan & Cromwell.[461] After

---

[454] *See* JX0491.

[455] JX0494 at 1; *accord* JX0490.

[456] PTO ¶ 160.

[457] *Id.* ¶ 163.

[458] *Id.* ¶ 164; JX0608; JX0629.

[459] PTO ¶ 165; JX0631.

[460] JX0628 at 3.

[461] PTO ¶ 167.

discussing the proposed merger, the board unanimously approved the proposed resolutions to adopt, execute and deliver the merger agreement.[462] The preponderance of the evidence shows that the board directed Shaich's negotiations and "arrive[d] at a definitive merger agreement embodying its decisions as to th[ose] matters."[463] Petitioners have likewise failed to prove that Shaich acted outside the bounds of the board's authorization.

Third, Petitioners assert the board negotiated in the dark, without a formal valuation by its advisors. The board entered negotiations with an existing deep knowledge of internal metrics of Panera's value. During the negotiations, the board analyzed seven valuation metrics with Morgan Stanley. When considering JAB's final offer, the board evaluated Morgan Stanley's standalone valuation for Panera.

Initially, the board did not have a full valuation, but it had steeped itself in management's numbers. At several prior board meetings, the board reviewed parts of the Five-Year Strategic Plan and Five-Year Financial Model. Without a valuation, the board was not prepared to make a counteroffer when JAB's initial offer came in,[464] so it limited its negotiating position to general pricing guidance.

---

[462] *Id.*; JX0630 at 2.

[463] Bainbridge, *supra* note 434, at 56.

[464] *See* Kwak Tr. 1214:18–1215:14 ("I don't remember that we suggested that [the board] not offer a number. But . . . as an advisor, we certainly were not in a position to make any

76

This dovetailed with Morgan Stanley's advice, based on JAB's bidding precedents, to focus on raising JAB's ceiling.[465]

On March 14, the board instructed Shaich to convey to JAB that it would not agree to any proposed offer for the company that was not significantly higher than $286.00.[466] Again, when JAB raised its offer to $296.50 and stated a max price of $299,[467] the board did not think JAB's $296.50 was high enough and directed Shaich to communicate to JAB that they expected additional value.[468]

Morgan Stanley met with management to review Panera's updated Five-Year Financial Model, an essential input for Morgan Stanley's valuation.[469] Morgan Stanley incorporated these numbers into its implied transaction multiples and

---

recommendations of a number at that time because we had not completed our valuation analysis.").

[465] *See supra* Section II(C)(3)(d).

[466] PTO ¶ 136. Moreton explained that "significantly higher" would "convey that [the board] had to get the best price that we could, and that we thought that they had to go over their ceiling. And we thought that when they had a chance to go through and do the diligence on the company, that they would be able to do that." Moreton Tr. 823:14–824:2. In rejecting JAB's initial offer, Shaich explained, "[i]n order for our Board to get fully comfortable with and supportive of a transaction, your value will need to reflect a price 'that begins with a 3' . . . [a]lthough I am not suggesting you need to be deeply in the $300s, I am also not talking about $300.00 either." JX2019 at 2.

[467] PTO ¶140; *accord* Shaich Tr. 1002:9–23; JX0483.

[468] PTO ¶ 141; JX0448 at 1.

[469] PTO ¶ 151.

illustrative valuation matrices.[470] On March 30, Morgan Stanley presented its preliminary valuation analysis to the board.[471] This presentation contained two illustrative valuation matrices, Panera's historical stock performance, next-twelve-month multiples, operating comparables, valuation comparables, precedent transactions, and JAB's precedent transaction overview.[472] This presentation did not include Panera's standalone valuation.

Morgan Stanley's full valuation, including Panera's standalone valuation, came on April 4, the day after the board received JAB's final $315.00 per share offer.[473] Also on April 4, the board discussed the updated Five-Year Financial Model.[474] The standalone valuation included two DCFs: the management case generated from Panera's Five-Year Financial Model, and the street case generated from consensus of broker projections.[475] The board assessed these metrics using its knowledge of the Five-Year Financial Model. When reviewing the management case DCF, Morgan Stanley cautioned the board that risks could prevent Panera from reaching the valuation predicted using the Five-Year Financial Model. Morgan

---

[470] *See* JX0552 at 3, 6.

[471] PTO ¶ 153; JX0545; JX0552.

[472] *See* JX0552.

[473] PTO ¶¶ 161, 165.

[474] *Id.* ¶ 164; JX0608; JX0629; Moreton Tr. 831:22–832:5.

[475] *See* JX0628 at 2.

78

Stanley explained that "[y]ou've got to believe that 80+% of your value is in the terminus" and highlighted risks in competition and execution.[476] The board asked questions about "assumptions used in the presentation and differences among the various valuation techniques."[477] The board ultimately decided that the management case "wasn't the proper way to look at the valuation."[478] Morgan Stanley presented its oral fairness opinion for the transaction, which it would provide in writing the following day.[479] After Morgan Stanley left, the board met in executive session and discussed the transaction and the Company's valuation.[480] The board found JAB's $315.00 offer consistent with its understanding of Panera's value and unanimously approved the transaction.[481]

It is problematic that the board, through Shaich, gave early guidance toward a price that was not "deeply in the $300s,"[482] but this pricing guidance was not a potentially binding counteroffer, and did not set a ceiling on the price. The board

---

[476] JX0625 at 3–4.

[477] JX0628 at 2; *accord* Moreton Tr. 843:14–845:3.

[478] Moreton Tr. 843:14–845:3.

[479] PTO ¶¶ 167, 171; JX0630 at 1; JX0647.

[480] JX0628 at 3.

[481] PTO ¶ 167; JX0628 at 3 (stating that after conferring as a board, "[t]he directors expressed their strong support for the proposed transaction, noting particularly that the price was fair for the Company's shareholders and that the deal protection mechanisms in the Merger Agreement were not preclusive to an alternative proposal for the Company's shares"); JX0630 at 2.

[482] JX2019 at 2.

rejected JAB's initial offer because it knew Panera's value from its continual review of the Five-Year Financial Model. Panera's strategy of pressuring JAB to raise its ceiling ushered in an offer that Morgan Stanley opined was fair and the board found consistent with its understanding of Panera's value. The board checked its understanding of Panera's value against Morgan Stanley's seven valuation metrics on March 31. And the board reviewed and discussed the Company's standalone value in depth on April 4 by reviewing the Five-Year Financial Model and Morgan Stanley's DCF valuations. Although the board did not have each of these valuation metrics at the outset of the negotiations, it reviewed each of them before it accepted JAB's final offer.

Fourth, while JAB conditioned its offer on confidentiality and speed, Panera's board valued those traits as a way to minimize disruption. The board had enacted confidentiality protections in its discussions with Starbucks, too. In both negotiations, Shaich and other board members used their Gmail accounts.[483] Shaich did this because he worried "intensely" about disruption.[484] At trial, Shaich explained:

---

[483] *Compare* JX0118, *and* Shaich Tr. 969:6–10, *with* JX0318 at 1, *and* JX0435, *and* JX0491, *and* Shaich Tr. 1000:12–23; 1004:19–1005:7.

[484] Shaich Tr. 1000:15–23, 1004:19–1005:13.

I am very sensitive to any discussion about anything that could be perceived as a potential acquisition and upsetting the company. . . . It would upset our relationships with our franchisees, our vendors, and, quite frankly, would shut down the work on this transformation plan for three to six months, whatever time period that would be the basic discussion in the company.[485]

Thus, JAB's desire for speed benefitted the Company.[486] Moreton explained it was "to our advantage to go quickly from the standpoint we don't want to disrupt our people either, if things got out in the press. So everyone said they had adequate time, so we said, Okay. Let's shoot for it."[487] Colasacco agreed: "I would like this period to be as short as possible, because I believe that eventually management becomes aware, general management becomes aware. In the due diligence process—other processes, it's hard—it's very hard to keep a secret."[488]

This internal practice aligned with Morgan Stanley's guidance to limit outreach outside of Panera. Morgan Stanley advised that JAB would "walk away if

---

[485] *Id.* 969:6–16; *accord id.* 957:8–24.

[486] JX0581 (stating JAB is "not interested in a protracted negotiation that results in significant management distraction, so they always go very quickly").

[487] Moreton Tr. 827:17–24.

[488] Colasacco Dep. 142:11–25; *see also id.* 143:6–9 ("[A] short period, a yea or nay period on whether [JAB] would . . . have an actual interest in signing an agreement was a positive.").

[Panera] or its advisors talk[ed] to other parties."[489]  Morgan Stanley encouraged compliance:

> Based on our familiarity with [JAB's] behavior, we did believe that their threat to walk was real.  And we do see potential buyers throughout our projects really do walk away if, for example, a deal leaks or they get roped into an auction process, because there are certain buyers that just have no interest being in part of an auction process.[490]

Redpath confirmed that "if you were serious about JAB, you would need to pursue those discussions on an exclusive basis."[491]

When JAB sought to accelerate the process by one week, Shaich conditioned the tight timeframe on "a full vetting of the five-year and our strategic presentation because for [Panera] this is a discussion of value" to ensure that JAB would "robustly (and genuinely) understand the drivers in the business [s]o they [could] fully appreciate the value that we understand is here and seek from them."[492]  The board also ensured Panera's advisors had adequate time.[493]  After conducting diligence and

---

[489] JX0418 at 2.

[490] Kwak Tr. 1197:16–1198:7.

[491] Redpath Tr. 658:1–11.

[492] JX0491.

[493] Moreton Tr. 827:17–24; *accord* Kwak Tr. 1233:14–20.

attending these meetings, JAB internally revised their target price upwards to $305.00 per share[494] and eventually offered $315.00.[495]

Finally, contrary to Petitioners' complaint, the board negotiated for less restrictive deal protections. Panera's deal protections included a no-shop provision with a fiduciary out, matching rights, and a 3% termination fee.[496] During negotiations, the board achieved a reduction in the termination fee from 4.0% to 3.0% by counteroffering 2.5%.[497] Kwak testified, "a 3 percent break-up fee is customary. And our rule of thumb is, generally for a transaction of this size, 3 to 4 percent is typical."[498] Kwak testified that the deal's no-shop with the fiduciary out and matching rights were also customary.[499] Redpath agreed.[500]

The board successfully negotiated a lower termination fee. Otherwise, it assented to the no-shop with a fiduciary out because the board understood that JAB was the only remaining logical buyer. The board otherwise assented to the deal

---

[494] JX0593 at 65.

[495] PTO ¶ 161.

[496] *Id.* ¶¶ 132, 161; JX0789 at 71–75, 79–81; *see also* JX0772 at 97–101, 106–107.

[497] PTO ¶¶ 160–61.

[498] Kwak Tr. 1241:10–15.

[499] *Id.* 1240:14–21, 1241:16–24.

[500] JX0990 at 39.

terms, including matching rights, which its advisors viewed as "customary."[501] Petitioners have not shown that the board failed to challenge JAB's suggested deal protections. Instead, the board "bargain[ed] for value in negotiating the deal protections and only acceded to the termination fee when it reached terms regarding price and deal certainty that it viewed as attractive."[502]

The preponderance of the evidence does not support a finding that the Panera board was apathetic, ignorant, or flat-footed. Rather, I find that the board started the negotiations well versed in Panera's financials and projections; empowered Shaich to press JAB to raise its price and fully consider Panera's internal evidence of value, and supervised the negotiations; obtained a full valuation in time to meaningfully consider JAB's final offer within JAB's compressed timeline; and successfully negotiated less restrictive deal protections. The board's performance does not render Panera's pre-signing process unreliable.

---

[501] Kwak Tr. 1241:16–22 ("Q. And there were also matching rights in the merger agreement here. In Morgan Stanley's view, did matching rights prevent other bidders from coming forward? A. It doesn't prevent. It may discourage in a way and make it more challenging, but it doesn't prevent other bidders from coming forward.").

[502] *Dollar Thrifty*, 14 A.3d at 614.

## 2. Shaich's personal interests did not undermine the sale process.

Petitioners contend that Shaich led negotiations despite personal conflicts, specifically his desire to retire. Shaich's prior attempts to step down had been unsuccessful, and Shaich disliked aspects of running a public company.[503] According to Petitioners, Shaich acquiesced to JAB's demand for exclusivity and left value on the table so that he could separate from the Company.[504]

In *Aruba*, the Delaware Supreme Court used the deal price as the most reliable indicator of value when making its fair value determination.[505] That was true even though the company's top executive had conflicting incentives over retirement. At trial, this Court found that these conflicts did not undermine the deal price as an indicator of fair value because the conflict "would not have changed [the company's] standalone value."[506] The *Stillwater* Court recently synthesized the role of conflicts

---

[503] *See* Shaich Tr. 1077:11–1079:14.

[504] Petitioners present a secondary contention that Shaich was apathetic on price because he focused on closing a deal so that he could liquidate and diversify his assets. There is no evidence in the record that he wished to liquidate. Redpath Tr. 645:12–646:11 (identifying no evidence of Shaich's intent to liquidate his Panera assets); Shaich Tr. 1022:20–1023:1 ("I hadn't diversified in 36 years. Why was I going to start now?"). For this reason, I focus my analysis on the potential conflict from Shaich's desire to step away from Panera.

[505] *Aruba*, 210 A.3d at 141–42.

[506] *See Stillwater*, 2019 WL 3943851, at *32–34 (citing *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 2018 WL 922139, at *7–8 (Del. Ch. Feb. 15, 2018), *reargument denied*, 2018 WL 2315943 (Del. Ch. May 21, 2018), *judgment entered* (Del. Ch. 2018), *rev'd and remanded*, 210 A.3d 128 (Del. 2019)).

in evaluating fair value: the "critical question" in considering a CEO's motivation is whether "personal interests undermined the sale process."[507]

A CEO's significant stock holdings may align her personal interests with the company's. "When directors or their affiliates own 'material' amounts of common stock, it aligns their interests with other stockholders by giving them a 'motivation to seek the highest price' and the 'personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so.'"[508] Alternatively, a CEO's personal interests can derail negotiations and cast doubt on the reliability of deal price as a fair value. In *Norcraft*, the Court found the CEO was as focused on securing a role with the future company as he was on securing the best deal price.[509] During the process, the CEO negotiated to divert funds from the merger into tax receivable agreements that would benefit him personally.[510]

Petitioners have not proven that Shaich was conflicted or otherwise uncommitted to obtaining the best price possible because he wanted to retire. The

---

[507] *Id.* at *32.

[508] *Chen v. Howard-Anderson*, 87 A.3d 648, 670–71 (Del. Ch. 2014) (quoting *Dollar Thrifty*, 14 A.3d at 600); *see also Merion Capital*, 2016 WL 7324170, at *22 (noting the CEO in "particular had an incentive to maximize the value of his shares, because he planned to retire.").

[509] *Blueblade Capital Opportunities LLC v. Norcraft Cos., Inc.*, 2018 WL 3602940, at *25 (Del. Ch. July 27, 2018), *judgment entered*, (Del. Ch. Aug. 8, 2018).

[510] *Id.*

record shows that when the Company needed him, Shaich came back to his role as Co-CEO with Moreton. And when Moreton had to step down, Shaich stayed on. Then, when Shaich's successor failed to materialize, he promised he would not leave the Company in a lurch.[511] Shaich repeatedly prioritized the Company's success over his preferred professional trajectory. Unlike the executive in *Norcraft*, Shaich did not negotiate future employment with JAB,[512] even with analyst speculation at closing that Shaich could now "run the company privately[,] [n]ot a bad deal!"[513]

The record shows that Shaich was intent on driving the price upwards. During the negotiations, the board cautioned Shaich, holding him back: on March 17, Moreton cautioned not to push it too hard by being too greedy, because "pigs get fat, hogs get slaughtered."[514] The next day, Shaich informed JAB that they would have to increase their initial offer beyond $300.00 per share.[515] During the negotiations, Morgan Stanley described Shaich as "supremely focused on finding a good home for the company and preserving the legacy of the business he's built for 35 years."[516] No evidence disturbs this conclusion.

---

[511] Shaich Tr. 1017:23–1018:10.

[512] Bell Tr. 1109:17–1111:8; Shaich Tr. 1023:10–13; Hurst Tr. 1349:14–1350:10.

[513] JX0777 at 2.

[514] JX0435; *accord* Moreton Tr. 822:9–823:1.

[515] JX2019 at 2.

[516] JX0582 at 1.

My perceptions of Shaich from trial do not fit with Petitioners' theory. Shaich testified that he would not have sold Panera without getting the best price.[517] I believe him. Shaich's commitment to realizing value for Panera appeared to run deep. In my view, his commitment stemmed from his pride in Panera, a desire to reward those who had built Panera with him, and an attachment to Panera itself.[518] Correspondence between Moreton and Shaich on the date of the sale shows Shaich's perspective. Moreton wrote:

> Ron - I imagine that you have thought about Louie and your Dad more than a few times these past few days. This morning I woke up thinking of George Kane and him asking you: Ronnie - how much cash do we have. The answer today would be quite a lot. I am sure George (and your Dad and Louie) are resting peaceful and are incredibly proud of you. You have touched so many lives . . . especially mine.[519]

Shaich replied, "Wonderful and very sad . . . Indeed I was thinking about my dad yesterday. He always told me to take the money . . . I always ignored

---

[517] Shaich Tr. 1024:7–1025:14.

[518] *See, e.g.*, Moreton Tr. 856:11–857:15 ("Mr. Shaich went to bed thinking about Panera and how to make it better and woke up thinking about Panera and how to make it better. He had the shareholders' interests in mind at all times."); Shaich Tr. 1021:10–1022:19 ("This was my life, and I very much wanted to maximize the value for that, and I very much wanted to do something that served all the constituencies of our company. In particular, our shareholders, who had hung with me through some tough times, and I wanted to deliver for them.").

[519] JX0657.

him . . . Though that has never been my way [t]his is probably the right time . . ."[520] Shaich's trial testimony on this email was credibly emotional.

After weighing all the evidence, I am convinced that Shaich would not, and did not, agree to a deal after a 35-year career before he found the right place and value for Panera. Shaich wanted to exit Panera and he led the negotiations. Those parallel facts do not convince me that either he or the impartial board accepted a low offer—or any offer—because of Shaich's personal goals. Shaich's desire to retire did not undermine the deal process or diminish Panera's standalone value. "As a matter of professional pride, he wanted to sell [Panera] for the best price he could."[521]

### 3. Morgan Stanley's actions and advice did not undermine the pre-signing process.

Petitioners view Morgan Stanley as a conflicted advisor because of the firm's late conflict disclosures, financial incentives, and backchannel discussions about financing via a JAB coverage banker. Petitioners also try to cast doubt on the adequacy of Morgan Stanley's representation. Respondent counters that Morgan Stanley informed the board of its prior work with JAB, and the board determined Morgan Stanley was not conflicted; Panera and Morgan Stanley used JAB's

---

[520] *Id.*

[521] *Stillwater*, 2019 WL 3943851, at *34.

coverage banker to drive up value; and Morgan Stanley's financial incentives aligned with Panera's stockholders. I take each in turn.

### a. Morgan Stanley disclosed its prior JAB work to the board.[522]

On March 15, the board initiated the process to retain Morgan Stanley as its financial advisor.[523] Moreton testified that he participated in those discussions, and that Morgan Stanley had disclosed its prior work for JAB.[524] Nothing in the record casts doubt on this testimony.[525] Then, on March 20, Sullivan & Cromwell informed the board that Morgan Stanley "had cleared an initial conflicts check on March 15 and the parties were now negotiating an engagement letter for the transaction."[526] Morgan Stanley provided its formal disclosure of past work with JAB on March 30, but the board already knew that Morgan Stanley had previous engagements with JAB.[527] There is no indication that these disclosures changed the board's view of

---

[522] As I determined above, although Shaich passed along JAB's suggestion that the board should choose either Barclays or Morgan Stanley, the board's legal advisor recommended Michael Boublik of Morgan Stanley, and the board followed that recommendation. *See* JX0466 at 2. Boublik did not have preexisting relationships with JAB. JAB did not select Panera's financial advisors.

[523] PTO ¶ 137.

[524] Moreton Tr. 816:11–21.

[525] Even Petitioners' process expert conceded that Morgan Stanley cleared conflicts. Redpath Tr. 673:16–674:1.

[526] JX0448 at 1.

[527] JX0562; Kwak Tr. 1222:7–16; *accord* Moreton Tr. 833:21–834:1 ("[Q.] Was this the first time that the board was learning that Morgan Stanley had previous engagements with

90

Morgan Stanley's ability to serve as its financial advisor. Moreton reflected on the disclosures and testified:

> [Y]ou wonder if it might be an advantage because they might understand JAB. And certainly, I had faith in the fact that the people that were going to work on the transaction on our behalf were of the utmost integrity, and so it didn't bother me individually or the board as a collective whole.[528]

The facts here diverge from those in *Jarden*, in which the board "made no inquiry" about advisor conflicts and "there [wa]s no indication that either [the CEO] or [the advisor] made any effort to disclose their past relationships to the board."[529] In this case, Morgan Stanley shared its past JAB work twice, including a formal representation letter. The board reviewed the formal disclosure in advance, even if only by a few days, before approving the deal. Petitioners have provided no basis to conclude that the timing of Morgan Stanley's disclosures undermined Panera's sale process.

---

JAB? A. No. The board knew about it immediately, as we did, so this was just more formal.").

[528] Moreton Tr. 816:22–817:7; *see also* Kwak Tr. 1197:6–1197:10 (testifying that "because [Morgan Stanley] had team members that [were] familiar with [JAB's] strategy, we were able to, very quickly, have discussions with Ron Shaich and Bill Moreton and to educate them on JAB's practices in the past").

[529] *Jarden*, 2019 WL 3244085, at *15 n.194.

### b. Morgan Stanley's financial incentives were commonplace and unremarkable.

Contingency clauses are standard in financial advisor agreements and seldom create a conflict of interest. "Contingent fees for financial advisors in a merger context are somewhat 'routine' and previously have been upheld by Delaware courts."[530] This Court has recognized that "[c]ontingent fees are undoubtedly routine; they reduce the target's expense if a deal is not completed; perhaps, they properly incentivize the financial advisor to focus on the appropriate outcome."[531]

Petitioners contend that Morgan Stanley's compensation relied on the signing and closing of the deal *with JAB*. Morgan Stanley's $40 million fee was contingent in part on signing for $8 million and in part on closing for $32 million.[532] The fee contingency does not specify that the signing and closing must have involved JAB for Morgan Stanley to be compensated under the terms of the agreement. Contrary to Petitioners' contention, the fact remains that, had another bidder emerged, Morgan Stanley's compensation would result from a "proposed sale of the Company" to "any buyer."[533]

---

[530] *Smurfit-Stone*, 2011 WL 2028076, at *23 (citing *In re Atheros Commc'ns, Inc.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011); *In re Toys 'R' Us, Inc., S'holder Litig.*, 877 A.2d 975, 1005 (Del. Ch. 2005)).

[531] *Atheros*, 2011 WL 864928, at *8.

[532] JX0789 at 52–53.

[533] JX0594 at 1; Kwak Tr. 1190:15–17.

A conflict in advising a company in favor of a sale rather than in remaining a standalone company is possible. No such conflict exists here. Morgan Stanley presented the board with a full valuation analysis that included a standalone valuation based on a number of metrics, including the comparatively high management case based on the Five-Year Strategic Plan. And although Petitioners contend that Panera should not have agreed to JAB's price because its standalone value was far higher, the $315.00 offer still fell within the management case's valuation range.[534] Rather than accepting the management case, the board recognized that there was execution risk to the Five-Year Strategic Plan, including that Shaich would not be there to guide Panera 3.0 and beyond. Both the board and Morgan Stanley found that the price was fair for the Company's stockholders. In any event, Morgan Stanley's fairness opinion would not have precluded a board determination that it was better for Panera to remain a standalone company.

### c. Both parties used Morgan Stanley coverage contacts outside the deal team to press their respective advantages.

In its disclosure letter, Morgan Stanley advised that with the exception of Gallagher, no senior deal team member "is a member of the coverage team for the Potential Buyer or the Buyer Related Entities."[535] Morgan Stanley did not create a

---

[534] JX0631 at 19, 38; Kwak Tr. 1280:22–1281:5.

[535] JX0562 at 3.

wall between its JAB coverage team, including Ciagne, and its Panera senior deal team.[536] Kwak testified that Morgan Stanley "didn't set up a wall because there was no conflict[.]"[537]

Ciagne, as a member of JAB's coverage team, relayed two communications between the deal teams. In the first, on March 27, JAB told Ciagne to tell Boublik that JAB feared Morgan Stanley was not doing enough to assure Panera that JAB could finance the deal.[538] In the second, on April 1, Boublik told Ciagne to tell JAB "Panera is serious, and there has to be a higher price."[539] Although the board did not know that Ciagne passed JAB's message to Boublik,[540] the board used Ciagne to pass its own message to JAB.[541]

Petitioners point to Ciagne's involvement as a fatal flaw in Panera's process. If this channel affected the deal price, it would have increased it. JAB limited their

---

[536] Kwak Tr. 1195:1–16, 1293:3–12, 1294:24–1295:2.

[537] *Id.* 1293:3–12.

[538] *See* JX2021.

[539] Moreton Tr. 837:9–838:9; *accord* JX0582 at 1 ("[O]ur goal is to have [Ciagne] deliver a message that (i) suggests our very strong confidence in [the] business and (ii) points to our valuation expectations, directionally.").

[540] Shaich Tr. 1068:21–1070:1; Moreton Tr. 905:7–908:11.

[541] Moreton Tr. 837:23–838:9 ("The purpose was not for this individual, who I never met, to negotiate. It was simply for one more message to Olivier that the price has to be over $300 and they have to do the best that they can. So we were pulling every lever we could think of to try to get the price increase.").

message to JAB financing, while the Company used it to ratchet up pressure and leverage the price. In my view, this flaw did not undermine a fair process.

### d. Petitioners have not shown that Morgan Stanley's advice was inadequate.

JAB's negotiation playbook contains four key principles: bilateral, confidential, friendly, and fast.[542] The playbook earned respect in the marketplace because JAB had intimated they would walk if their counterpart did not follow it.[543] But on one occasion when a JAB target, Krispy Kreme, pushed JAB to deviate to the target's advantage, JAB still closed the deal.[544] Morgan Stanley knew about Krispy Kreme's success, and Petitioners fault Morgan Stanley for not counseling Panera to similarly pursue a go-shop or reduced termination fee.

Petitioners fail to acknowledge that Morgan Stanley informed the board of Krispy Kreme's negotiation process and advised Panera to adopt a similar negotiation strategy.[545] Morgan Stanley educated Shaich and Moreton "very quickly" on JAB's negotiation playbook and assisted them in developing their own

---

[542] Bell Tr. 1107:24–1108:17.

[543] Kwak Tr. 1197:16–1198:7.

[544] JX0455 at 13–23.

[545] *Id.* at 5, 13–23.

strategy.[546] On March 17, Boublik sent Shaich and Moreton a proposed script and slide decks summarizing "JAB Historical Bidding Precedents" and "JAB Merger Backgrounds."[547] Morgan Stanley presented these detailed precedent analyses when the board was "thinking about strategies in terms of how to go back to JAB in terms of negotiation . . . to show that JAB has bid up from their initial bid in the past and . . . to show how much they had bid up after their initial bid."[548] Shaich reviewed this deck and used it to inform his negotiation strategy.[549]

Moreton viewed these decks as "very important" because "they were able to show us, in the bidding precedents, how JAB's transactions had gone from the initial discussions and initial bids, through due diligence, to the end, and how they had a history of raising their offer price as they went through."[550] Shaich stayed up digesting this deck until 3 a.m.,[551] and later thanked Boublik "for [his] very valued

---

[546] Kwak Tr. 1196:22–1197:10 (attributing Morgan Stanley's insights into the JAB playbook to Gallagher, who was a JAB coverage team member), 1206:15–1207:6; *accord* JX0431 at 1; JX0432.

[547] PTO ¶ 138; JX0455.

[548] Kwak Tr. 1202:5–1203:9.

[549] Shaich Tr. 997:6–998:3.

[550] Moreton Tr. 821:15–822:8.

[551] *See* Shaich Tr. 996:10–997:5.

input," noting "it really made a difference in how [Shaich] approached it . . . particularly relative to the history of their other deals."[552]

The JAB Merger Backgrounds deck detailed the Krispy Kreme offer, strategy, and negotiation timeline. After JAB made Krispy Kreme an initial offer, Krispy Kreme asked for more time because it did not have a complete long-term financial plan and felt it could not yet "appropriately assess JAB Holdings' indication of interest."[553] While Krispy Kreme was securing this information and advisors, JAB postponed the Krispy Kreme negotiations until after it closed an acquisition with Keurig Green Mountain, Inc.[554] While JAB was working on the Keurig deal, a financial buyer expressed interest in Krispy Kreme, but did not engage in negotiations.[555] Four and a half months after the initial offer, JAB and Krispy Kreme resumed their negotiations.[556] Krispy Kreme's board insisted on additional value

---

[552] JX0456 at 2. At trial, Shaich explained how Boublik "pushed [him] at some critical times when there was a question to push for more price, and to push against JAB for more price." Shaich Tr. 995:18–996:6; *see also id.* 1003:11–21 ("He pushed me intensely. I mean, you know, there's this question, you don't want to blow this up. On the other hand, you want to push for as much as you can get, X plus 1. And Michael and I went through, and we went through their precedent history, and I think the sense was it was a wise, all considered, smart bet to push this deal further, even though this was already a very attractive offer for the company.").

[553] JX0455 at 15.

[554] *Id.* at 17.

[555] *Id.*

[556] *Id.* at 18.

based on their internal diligence, and threatened a go-shop unless JAB increased the price and reduced the termination fee.[557] JAB accepted Krispy Kreme's counteroffer, resulting in a 12% bid premium and a reduced termination fee.[558] Petitioners assert that Krispy Kreme negotiated for six months, when in reality, JAB postponed negotiations while pursuing another deal. Once they resumed negotiations, they lasted forty-five days.

In comparison, Shaich initially reached out to JAB in August 2016, but JAB was pursuing another transaction at the time. At the conclusion of that deal, Panera and JAB negotiated for forty days. Unlike Krispy Kreme, Panera's board did not need additional time to educate itself on Panera's long-term financial plan: the Five-Year Financial Model was the board's catechism. Like Krispy Kreme, the board insisted that JAB find additional value through diligence.

Petitioners assert that Morgan Stanley should have advised the board to seek a go-shop like Krispy Kreme. Krispy Kreme had another interested bidder. Panera's board and Morgan Stanley understood that there were no other bidders out there with the interest and capacity to purchase Panera.[559] Accordingly, instead of pursuing a

---

[557] *Id.* at 21.

[558] *Id.* at 5.

[559] Kwak Tr. 1200:4–17 (sharing Morgan Stanley's perspective with the board that "it wasn't likely that the potentially interested parties that we had, considering at that time their strategic rationale and a potential combination with Panera, and . . . their ability to

go shop, the board obtained a lower 3.0% termination fee and conditioned JAB's timeline on a review of the Five-Year Strategic Plan and Five-Year Financial Model, which generated an additional $18.50 in value.[560] In the end, no other party expressed an interest in acquiring Panera, which confirms the board's understanding that a go-shop would not result in a higher price for Panera stockholders. Morgan Stanley did not fail to advise the board about prior negotiating strategies. Rather, I find Morgan Stanley helped the board implement a proven negotiation strategy, with the lessons learned from the Krispy Kreme transaction, to generate additional value.

Next, Petitioners contend that Morgan Stanley provided inadequate substantive advice by failing to perform a leveraged buyout ("LBO") analysis, thereby failing to assess a financial sponsor's ability to purchase Panera. Morgan Stanley understood that "for an LBO of [$]6 to $7 billion, putting in equity that represents more than 60 percent of the total purchase price is just not what financial sponsors do for their LBO."[561] Petitioners' process expert agreed that it was unlikely that a financial sponsor would be interested in Panera,[562] and Petitioner's valuation

pay an all-cash offer . . . [were] going to be likely to compete with a transaction that JAB had put forth"); Shaich Tr. 1021:13–16 ("[I]t was just patently clear to me that, knowing what I know, and knowing these people and where this had played out, that there really wasn't a viable interested party.").

[560] JX0491; *accord* JX0490.

[561] Kwak Tr. 1199:9–24; *see also id.* 1228:18–1229:5.

[562] *See* Redpath Tr. 663:10–664:22.

expert failed to perform an LBO analysis.[563] Petitioners have not shown any flaw with Morgan Stanley's focus on strategic bidders. This is especially true when Morgan Stanley found that financial sponsors could not afford Panera, and identified only one bidder besides JAB that could afford Panera: Starbucks.[564]

To Petitioners, Morgan Stanley's most significant shortcoming is its failure to evaluate Panera's standalone value until the final day of the transaction. Petitioners have not shown that the board did not know Panera's standalone value before it approved the merger. The board had a deep knowledge of Panera's performance and projections derived from the Five-Year Strategic Plan that it reviewed at every meeting,[565] including the March 1 board meeting.[566] The board received and reviewed Morgan Stanley's full valuation before voting for the merger.[567] That valuation included a standalone valuation derived from the Five-Year Strategic Plan.[568] Petitioners have not shown that reviewing the valuation earlier would have convinced the board to reject JAB's offer, or that the valuation even encouraged remaining a standalone entity. The deal price fell within the range of the

---

[563] *See generally* JX0983.

[564] Kwak Tr. 1226:21–1227:12; Shaich Tr. 1019:18–1020:5.

[565] Shaich Tr. 951:21–952:2.

[566] *See* JX0407 at 1, 46–205; JX0408 at 2–3.

[567] *See* JX0631.

[568] *Id.* at 15–20.

management case DCF.[569] While the board had very little time with the valuation, this flaw did not undermine value, particularly given the board's facility with Panera's financials.

In all, I find that some of the Company's pre-signing deal decisions were sub-optimal. Morgan Stanley's JAB coverage banker was involved in the deal communications, Shaich pushed for an offer "not deep in the 300s" before the board received a full valuation, and the accelerated timeline meant the board had very little time with Morgan Stanley's valuation. I find that these issues did not undermine the sale process "so as to prevent the deal price from serving as a persuasive indicator of fair value."[570]

Panera's board had a deep knowledge of the market and of Panera's value. The board led discussions with the two logical bidders, which were identified by the board through their extensive personal knowledge, and by Goldman in 2015, Goldman in 2017, and Morgan Stanley in 2017. The board negotiated with JAB according to their advisors' strategy, which was tailored to JAB and executable based on the board's working knowledge of Panera's value. The board authorized Shaich to lead these negotiations, which he did in reliance on board members and Morgan Stanley; in full transparency to the board; and in relentless pursuit of value.

---

[569] *Id.* at 19.

[570] *Stillwater*, 2019 WL 3943851, at *30.

That strategy successfully extracted two price increases totaling $18.50 per share and a lower termination fee, and generated a final offer that the board concluded was fair in view of Morgan Stanley's comprehensive valuation. Panera's outreach to the only two logical buyers resulted in a deal that both the board and its advisors identified as fair to its stockholders. Accordingly, I find Panera's deal process to be persuasive evidence of fair value.

## D. Respondent Has Proven $11.56 In Synergies.

Section 262 mandates that I determine fair value "exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation."[571] I must "exclude from any appraisal award the amount of any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a stand-alone going concern, but as a part of a larger enterprise, from which synergistic gains can be extracted."[572] This excludes not only "the gains that the particular merger will produce, but also the gains that might be obtained from any other merger."[573] And because deal price is a persuasive

---

[571] 8 *Del. C.* § 262(h) ("[T]he Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation . . . .").

[572] *Aruba*, 210 A.3d at 133 (quoting *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd.*, 847 A.2d 340, 356 (Del. Ch. 2004)).

[573] *Id.* (citing *Solera*, 2018 WL 3625644, at *1; *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 60–64 (Del. Ch. 2007); *Union Ill.*, 847 A.2d at 355–56).

metric of fair value in this case, I must also "excise[] a reasonable estimate of whatever share of synergy or other value the buyer expects from changes it plans to make to the company's 'going concern' business plan that has been included in the purchase price as an inducement to the sale."[574]  Respondent bears the burden of proving any downward adjustment to deal price.

Respondent contends that the Court should excise $21.56 per share from the deal price because it proved that JAB anticipated, and paid for, synergies from deploying their characteristic management framework.  Respondent identifies three categories of such synergies:  incremental cost savings, incremental leverage tax benefits, and revenue synergies.  Petitioners generally assert that JAB is a financial sponsor, not a strategic buyer, and specifically challenge Respondent's evidence of synergies.

Panera's board and financial advisors viewed JAB as a strategic buyer,[575] and JAB identified Panera as a strategic acquisition.[576]  JAB had previously acquired

---

[574] *Id.* (citing *Solera*, 2018 WL 3625644, at *1; *Highfields Capital*, 939 A.2d at 59–61; *Union Ill.*, 847 A.2d at 343); *see also DFC*, 172 A.3d at 368 (recognizing that a "going concern" valuation requires the court to excise "any value that might be attributable to expected synergies by a buyer, including that share of synergy gains left with the seller as a part of compensating it for yielding control of the company").

[575] Shaich Tr. 956:4–957:7; Moreton Tr. 824:3–12; Kwak Tr. 1200:18–1201:14.

[576] *See* JX0400 at 3–4.

Einstein Bros., Caribou Coffee, and Krispy Kreme.[577]  JAB identified Panera as a

"Fresh Baked / Coffee Adjacency" that would fill gaps in their portfolio by

expanding JAB's holdings in the coffee and fresh baked lunch category.[578]   Even

if JAB were not a strategic buyer, labeling them as a financial acquirer would not do

the work Petitioners hope it would.  "[I]n theory, if the acquisition of a company by

a financial acquirer is at a market price that includes speculative elements of value

which arise only from the merger, that acquisition value may exceed the going-

concern value."[579]  That is the case here.

JAB has a three-pronged "playbook" that they implement after a deal closes.

That playbook addresses people, cost and cash, and growth.[580]  Under the people

prong, JAB develops a "short list of CEO candidates," installs a "CFO and

establish[es] Product Management Office," assesses the "management team," and

deploys the "JAB ownership model."[581]  Under their cost and cash prong, JAB

identifies "[q]uick wins in cash, working capital (particularly AP), [and] cost

---

[577] *Id.* at 4.

[578] *Id.* at 3–4.

[579] *Huff Fund Inv. P'ship v. CKx, Inc.*, 2014 WL 2042797, at *2 (Del. Ch. May 19, 2014), *judgment entered,* (Del. Ch. June 17, 2014), *aff'd,* 2015 WL 631586 (Del. Feb. 12, 2015) (TABLE); *see also Petsmart*, 2017 WL 2303599, at *31 n.364 (recognizing "synergies financial buyers may have with target firms arising from other companies in their portfolio").

[580] JX0400 at 32.

[581] *Id.*

structure" to implement a "cash and cost discipline culture."[582]  As for growth, JAB conducts target-specific analyses and identifies strategic opportunities from combining companies under its umbrella.[583]  JAB approached Panera with the intention of extracting synergies through these plays.  JAB's pre-diligence model, setting a target price of $290.00, was based in part on value gains from implementing their playbook at Panera.[584]

First, JAB measured the investment opportunity for its cash and cost prong, recognizing Panera's lack of "discipline culture" in working capital and supply chain.[585]  JAB's initial investment model outlined $300 million in working capital savings.[586]  JAB had successfully implemented working capital changes at Krispy Kreme, Caribou Coffee, and Peet's Coffee.[587]  JAB planned similar changes for

---

[582] *Id.*

[583] *Id.*

[584] *See id.* at 43–44.

[585] *Id.* at 32, 34, 37.

[586] *Id.* at 43.

[587] JX0554 at 15 ("Cost rationalization and synergies.  JAB's plans to achieve cost synergies and working capital improvements could fail to materialize . . . . Mitigating factors:  JAB has a long-track record of successful acquisitions and integration, and have delivered expected cost savings on recent deals including Keurig Green Mountain and Krispy Kreme."); JX0589 at 19 ("Working Capital—Panera currently has ~ 4 days payable compared to Keurig at ~50, Caribou at >90, and Peet's at ~ 85."); *accord* Bell Tr. 1121:13–1122:10, 1123:3–23; Hubbard Tr. 1495:8–19.

Panera by increasing the Company's days payable outstanding from about four to about fifty to ninety days.[588]

As for cost savings opportunities, JAB identified potential savings in SG&A, store level efficiency, and supply chain amounting to $70 to over $100 million.[589] To accomplish this, JAB hoped to cut public company expenses, optimize franchise costs, introduce procurement savings, and reduce waste.[590]

After performing due diligence, JAB concluded their diligence confirmed "significant" opportunities for cash and for cost savings.[591] JAB confirmed $300 to $500 million by maximizing working capital, more than $30 million in procurement savings, $18 million in SG&A optimization, $15 million in supply chain optimization, and $2.5 to $5 million in public company costs.[592] JAB expanded working capital estimates as "[Panera] currently has the lowest [days payable outstanding] across nearly all public peers and much lower than other JAB Beech

---

[588] JX0982 at 51; *accord* Hubbard Tr. 1666:5–13.

[589] JX0400 at 37.

[590] *Id.*; JX0589 at 23.

[591] *See* JX0593 at 49–50.

[592] JX0593 at 49–50, 52–54, 78; JX0982 at 49–50; Bell Tr. 1131:12–22. Shaked agreed with the public company cost savings. *See* Shaked Tr. 368:4–16.

assets."[593] At this point, JAB recognized that they would have to pay more than their early target price[594] and raised their internal target offer from $290.00 to $305.00.[595]

In addition to the management playbook, JAB applied their bedrock negotiation playbook principle of not conditioning their deal on receiving financing approval, and securing financing during the diligence phase.[596] Respondent noted that because JAB financed $3 billion for the deal, Panera would carry greater debt than it did as a standalone value.[597] JAB quantified their anticipated debt and associated tax effects when they formulated their target deal price.[598]

Hubbard found that "[i]nternal documents show that JAB anticipated significant synergies from the acquisition of Panera, and factored these synergies into their valuation of Panera."[599] Hubbard found that with increased debt, Panera would have higher interest tax deductions, generating a merger-specific tax synergy

---

[593] JX0593 at 49.

[594] Bell Tr. 1133:9–18.

[595] *See* JX0593 at 65.

[596] Bell Tr. 1106:21–1107:23.

[597] Hubbard Tr. 1493:24–1494:7.

[598] *See* JX0593 at 69.

[599] JX0982 at 41.

of $9.18 per share.[600]  Hubbard agreed with the cost and cash synergies as well, finding synergies totaling $37.29 per share.

Petitioners argue that these cost savings and tax synergies are not merger-specific synergies because Panera management could have also made these changes.[601]  In support, Petitioners cite *Huff Fund Investment Partnership v. CKx, Inc.*, in which this Court found that the record contained insufficient evidence to support a finding that the respondent formed its bid on, or believed that there were, merger-specific cost savings.[602]

That is not true of this case.  Panera's management culture and priorities did not support the changes JAB intended to make.  Panera was in the "habit" of paying its vendors within four to six days[603] and invested in extensive initiatives.[604]  JAB's "Cash Opportunities" arose from Panera's failure to "focus on working capital at all" while spending "top dollar to get the best without ever re-engineering costs out

---

[600] *Id.* at 54; Hubbard Tr. 1493:24–1494:7.

[601] Petitioners' expert testified "the company elected not to" increase its days payable outstanding.  Shaked Tr. 451:2–8.

[602] 2014 WL 2042797, at *3.  The Court explained it was not "reaching the theoretical question of under what circumstances cost-savings may constitute synergies excludable from going-concern value under Section 262(h)."  *Id.*

[603] Hurst Dep. 219:4–23 ("[T]he general philosophy had been pay quickly, use that as leverage in some of the vendor relationships to actually get a lower price.  But it ultimately became just the habit of Panera."); *accord* Shaked Tr. 451:21–452:13.

[604] JX0984 at 42 ("Panera invested over $120 million in IT from mid-2014 through mid-2017.").

of the business."[605] Panera forecasted cost savings, but limited its changes to sourcing and process improvements.[606] Any overlap between Panera's forecast and JAB's playbook demonstrates differences in scale. As an example, Panera evaluated "FDF" and G&A savings in its forecast, predicting new cost savings between $300,000 and $600,000 each year from 2018–2021;[607] JAB projected $18 million in its first year alone.[608] JAB believed that it could achieve much greater savings because of its expertise in executing those savings across their portfolio companies.[609] When Hurst saw JAB's plan, he thought JAB had "lost their freakin' minds based on SG&A savings."[610] JAB contemplated "Day 1 [p]laybook implementation."[611]

As for the tax synergies, Petitioners argue that Panera could "re-leverage its balance sheet as it saw fit" so the tax deductions associated with JAB's $3 billion financing were not an element of value arising from the merger.[612] Petitioners

---

[605] JX0400 at 37.

[606] *See* JX0607 at 181–85.

[607] *See id.* at 185.

[608] *See* JX0593 at 78.

[609] Bell Tr. 1122:4–1123:23; *cf.* JX0904 at 1.

[610] Hurst Dep. at 203:8–24 (internal quotation marks omitted).

[611] *See* JX0593 at 48.

[612] PTO ¶ 76.

concede that Panera's debt increased "dramatically" after the transaction, from $480 million to $2.7 billion.[613] Here, unlike in *Huff*, the evidence shows JAB had similarly financed other deals in the past and saw value in doing it again with Panera, while Panera intentionally maintained low debt.[614]

The preponderance of the evidence demonstrates that JAB formed its bid in anticipation of applying its management playbook to Panera to generate merger-specific savings. Before JAB made an offer, it recognized that it could realize working capital and cost savings when it ran its plays on Panera. JAB formed its initial offer in view of that predicted value. JAB confirmed it could realize that value during due diligence, and that conclusion informed their offer price. JAB predicted additional value in tax savings from increasing the Company's debt through JAB's characteristic financing technique. Hubbard calculated the combined value of these synergies at $37.29 per share.[615] I find that by running its plays on Panera, JAB predicted $37.29 in value arising out of the merger.

Hubbard estimated that JAB built in 31% of these synergies, or $11.56, into the merger price.[616] In support, Hubbard cites a 2013 Boston Consulting Group

---

[613] D.I. 139 at 58.

[614] JX0593 at 77 ("The company had $332.0 million of net debt in December 2016."); JX0238 at 16.

[615] JX0982 at 55.

[616] *Id.* at 55–56.

study of 365 deals that analyzes the "median portion of synergies shared with the seller."[617] Petitioners object to the BCG study's breadth and its lack of specificity across industry or comparable companies. Respondent cites *Solera* for the proposition that this study is an appropriate estimation of synergies belonging to the buyer.[618] But the adoption of a methodology, expert opinion, or metric in one appraisal action does not mandate its adoption in a different appraisal action.[619] This Court's previous acceptance of Hubbard's proffered study is not conclusive in this case. Instead, I find that Petitioners have not cast doubt on the reliability of this study, or put forward a more appropriate percentage. Respondent has proven deduction of cost and tax synergies of $11.56 per share by a preponderance of the evidence.[620]

---

[617] *Solera*, 2018 WL 3625644, at *28 & n.364.

[618] *Id.* at *28 & n.364.

[619] *Jarden*, 2019 WL 3244085, at *1 ("The appraisal exercise is, at bottom, a fact-finding exercise, and our courts must appreciate that, by functional imperative, the evidence, including expert evidence, in one appraisal case will be different from the evidence presented in any other appraisal case."); *accord Stillwater*, 2019 WL 3943851, at *20 ("[T]he approach that an expert espouses may have met 'the approval of this court on prior occasions,' but may be rejected in a later case if not presented persuasively or if 'the relevant professional community has mined additional data and pondered the reliability of past practice and come, by a healthy weight of reasoned opinion, to believe that a different practice should become the norm . . . .'" (quoting *Golden Telecom Trial*, 993 A.2d at 517)).

[620] Petitioners argue that the Court should not agree with Hubbard's analysis because he "ignores the negative synergies, or costs, that resulted from the acquisition." D.I. 140 at 81. Petitioners have not shown that JAB failed to consider these costs when JAB evaluated

111

I turn now to JAB's third playbook prong of growth, in which Respondent sees revenue synergies. Unlike the cost and cash playbook prongs, JAB did not quantify these growth opportunities in its models. JAB recognized that while it is "relatively simplistic to quantify potential cost savings[,] [i]t's much more difficult to quantify for-sure growth areas, even though they may be extremely important."[621] Leading up to and throughout trial, Respondent and its expert presented a fair value that did not quantify any revenue synergies attributable to JAB's growth opportunities. This is consistent with the record evidence and both parties' experts' opinions.

In their pre-diligence model, JAB identified growth opportunities for coffee, technology, international expansion, and CPG.[622] At a March 31 meeting, Panera also identified opportunities in international franchising, CPG (including coffee), and technology.[623] After this meeting, on April 2, JAB created its post-diligence model, expressly clarifying that CPG, coffee, and international expansion were

---

their implementation of their playbook, calculated Panera's resulting value, or formed their offer price. I do not find that this undermines Hubbard's synergy analysis.

[621] Bell Tr. 1127:13–21.

[622] *See* JX0400 at 38–41. Possible plans included leveraging Panera's technology platform across JAB's portfolio, enhancing Panera's in-store coffee program, focusing on CPG, increasing K-cup sales, and expanding internationally. *Id.* at 32.

[623] *See* JX0564 at 131, 141–152, 154–158.

"Growth Areas Not in [the] Investment Model[.]"[624]  In this same model, as explained, JAB increased its internal target price to $305.00 based on quantified anticipated cost savings.[625]

At an April 3 meeting, the parties again discussed opportunities for CPG, coffee, international expansion, technology, as well as marketing, real estate, food sourcing, and franchising.[626]  Bell testified that these strategic growth opportunities played a role in JAB's decision to increase their offer from $305.00 to $315.00[627] because JAB

> did some back-of-the-envelope math and got excited about it.  But since we had no discussion with anyone about it, and it was a short period of time, we didn't, quote/unquote, put it in the model, financially.  But I will tell you—you even heard it earlier—coffee was core to our strategy of doing this.  It's just something that was difficult for us to quantify at the time we were doing diligence.[628]

---

[624] *See* JX0593 at 57–62.  Although JAB had developed a "coffee procurement savings program," they did not include these synergies in the post-diligence model.  *Id.* at 60–61; *accord* Bell Tr. 1123:3–1126:19, 1129:2–24.

[625] *See* JX0593 at 65.

[626] *See* JX0607 at 145, 155–169, 171–175, 229.

[627] *See* Bell Tr. 1135:1–10 ("Q.  And when you went higher, to 315, did those strategic opportunities or synergies play a role in the decision to raise your offer from 305 to 315? A.  I would say they did, because, you know, again, as a long-term holder, we ended up for this one going to a price that was below . . . a return.  That we priced into a return that was below what we initially thought we would have to do.  But we took a big leap of faith on these strategic opportunities, which we didn't quantify in the model.").

[628] *Id.* 1129:5–24.

Bell testified that JAB took a "leap of faith" on these "strategic opportunities," and justified the $10.00 increase with their "back-of-the-envelope" calculations.[629] Later, Bell testified that coffee procurement was not a "back-of-the-envelope" calculation because JAB "hadn't done the analysis."[630]

After trial, Respondent latched onto a new synergy theory that deducted $10.00 per share for these growth or revenue synergies. Respondent's post-trial position finds no support from its expert. Hubbard did not include any revenue synergies in his analysis.[631] When pressed, Hubbard affirmatively declined to adopt Bell's testimony, as he saw no support for it in the trial exhibits or in his work for Respondent.[632] "Thus, in its zeal to reach a desired litigation outcome, Respondent finds itself in the awkward position of advancing a position at odds with its own expert . . . ."[633] At post-trial argument, Respondent's counsel explained that they "never asked [Hubbard] to adjust his opinion" because the trial strategy required

---

[629] *Id.* 1132:5–21; 1134:19–1135:10.

[630] *Id.* 1168:8–21 ("Q. Coffee procurement, was that one of the ones that was on the back of the envelope? A. I don't even think it was that, because we hadn't done the analysis.").

[631] *See* JX0982 at 55–56; *accord* Hubbard Tr. 1593:17–1594:3, 1694:22–1695:8.

[632] Hubbard Tr. 1482:18–24, 1663:6–14, 1664:20–24, 1665:24–1666:4.

[633] *Manichaean Capital, LLC v. SourceHOV*, C.A. No. 2017-0673-JRS, at 54 (Del. Ch. Jan. 30, 2020).

Hubbard to stick with his synergy analysis, leaving counsel to argue the additional $10.00 in synergies in post-trial briefing.[634]

This series of events casts doubt over Respondent's post-trial position on revenue synergies. At bottom, Respondent puts forward conclusory fact testimony contradicted by JAB's contemporaneous financial modeling and rejected by its expert. There is no evidence that JAB quantified revenue synergies. JAB's financial modeling assumes the opposite: "no uplift . . . from any strategic synergy opportunities."[635] JAB's contemplation of potential growth opportunities is insufficient to prove ten dollars' worth of revenue synergies in JAB's best and final offer price. Further, JAB provided no evidence to support the conclusion that all ten dollars inured to JAB's benefit and should be excised from the amount paid to stockholders. Hubbard did not find any revenue synergies, and therefore did not apportion any. Respondent has failed to prove revenue synergies that would support an excise of $10.00 from the deal price. In all, Respondent has proven $11.56 from its cost savings and tax synergies. The deal price minus synergies valuation method yields a price per share of $303.44.

---

[634] D.I. 154 at 117:21–120:13 ("We never asked him to adjust his opinion. . . . And, you know, frankly, Your Honor, that's a trial strategy decision that I made, right? These are the sort of things that we do. And I still think that we have a strong record evidence for this $10.").

[635] JX0593 at 64.

**E.    The Supplied Alternative Valuation Methodologies Are Unreliable.**

While Respondent asserts that deal price minus synergies deserves dispositive weight, Petitioners press three alternative valuation methodologies:  discounted cash flow ("DCF"), comparable companies, and precedent transactions.[636]  In the context of a persuasive deal price, I disregard those methodologies for the reasons that follow.

**1.    Petitioners have not proven their DCF model's reliability.**

"While the particular assumptions underlying its application may always be challenged in any particular case, the validity of [the DCF] technique *qua* valuation methodology is no longer open to question."[637]  Nevertheless, the Supreme Court "cautioned against using the DCF methodology when market-based indicators are

---

[636] Neither party argues in favor of the unaffected stock price.

[637] *Pinson*, 1989 WL 17438, at *8 n.11.  "The DCF model entails three basic components: an estimation of net cash flows that the firm will generate and when, over some period; a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value."  *Cede & Co. v. Technicolor, Inc.*, 1990 WL 161084, at *7 (Del. Ch. Oct. 19, 1990).

available."[638]   Compared to a persuasive, market-based deal price metric, "the DCF technique 'is necessarily a second-best method to derive value.'"[639]

Petitioners and Respondent each introduced a DCF valuation prepared by their expert. Hubbard introduced a DCF that generated a value of $291.71 per share.[640]   He gave his DCF no independent weight, but viewed it solely as corroborative of his deal-price-minus-synergies value of $303.44.[641]

In a "very subjective" weighting exercise, Shaked gave sixty percent weight to his DCF model, which generated a value of $354.00 per share, exceeding the deal price by $39.00.[642] By this model, Shaked asserted over a billion dollars was left on the table.[643]   The experts are approximately $63.00 per share apart.   Because Petitioners are urging the Court to give significant weight to Shaked's DCF model, they bear the burden of convincing the Court that the model is sufficiently reliable to merit weight in the face of Panera's reliable deal process.

---

[638] *Stillwater*, 2019 WL 3943851, at *60 (citing *Dell*, 177 A.3d at 37–38, and *DFC*, 172 A.3d at 369–370, 369 n.118).

[639] *Id.* at *61 (quoting *Union Ill.*, 847 A.2d at 359).

[640] JX0982 at 84.

[641] As explained, Hubbard did not accept Respondent's post-trial market value of $293.44.

[642] Shaked Tr. 179:12–181:12, 239:24–241:17.

[643] Hubbard Tr. 1483:15–1584:11.

Petitioners have fallen short: Shaked's model as presented at trial is of questionable reliability. The primary flaw is Shaked's concession regarding the investment rate for the terminal period. In his report, he put forward an investment rate of 3.1% that he "conservative[ly]" cushioned with a $116 million buffer, as "kind of an extra slack for the maintenance."[644]

Hubbard put forward a 35.6% investment rate.[645] This rate was based on the principle that "growth isn't free,"[646] particularly in the extraordinarily competitive restaurant industry.[647] He anchored his investment rate in Panera's historical investment rate,[648] and utilized the formula IR=g/RONIC, where the investment rate equals the terminal growth rate over the return on new invested capital.[649] Hubbard set RONIC equal to the weighted average cost of capital ("WACC") on the premise that "[i]n a competitive industry, abnormal profits tend to vanish over time."[650] In

[644] Shaked Tr. 203:9–19 (explaining the reason for the buffer as a hypothetical: "let's assume that in my terminal year, the maintenance will be 259, not 143. This is 81 percent increase compared to what it used to be. Last year is 143, and I assume that it will be 259. So I build in $116 million, kind of an extra slack for the maintenance").

[645] JX0982 at 95–96.

[646] D.I. 141 at 67 (citing Hubbard Tr. 1536:22–1537:7).

[647] Id. (citing JX0982 at 14–20; Goldin Tr. 1409:22–1411:24).

[648] See id. at 68 (citing Hubbard Tr. 1546:17–1547:6; 1687:7–19).

[649] JX0982 at 96.

[650] Id.

118

Respondent's view, Shaked's original investment rate assumed "startlingly high returns on ROIC [([return on invested capital)] forever."[651]

When Shaked took the stand at trial, he addressed this criticism by presenting for the first time a "corrected" ROIC chart with an investment rate that diverged from, and was significantly higher than, the investment rate in his report.[652] Shaked did not base his "corrected" chart on the analysis found in his report or mentioned in his deposition. Notwithstanding this correction, Shaked did not adjust his DCF with the "corrected" investment rate.

When Hubbard applied Shaked's corrected investment rate to his other DCF inputs, he found "the valuation attached to this [investment rate] is $100 off the one he is tendering."[653] Hubbard testified that if Shaked were to plug his corrected 33% investment rate into his DCF, this would erase much of the difference between the experts' DCF calculations.[654]

After Hubbard's testimony, Shaked took the stand as a rebuttal witness, but did not address his failure to adjust his DCF in light of his corrected investment

---

[651] *See* D.I. 141 at 63.

[652] Shaked Direct Demonstrative Deck at 148 ("Assumed Panera will be using 2/3 of its net income to pay out dividends and/or repurchase shares, and will have 1/3 of it flow to retained earnings (grow book value of equity)."); *see* Hubbard Tr. 1571:21–1572:18.

[653] Hubbard Tr. 1571:21–1572:18.

[654] *See id.* 1570:9–1571:15.

rate.[655] Shaked's trial concession on his investment rate weakens his credibility: he abandoned the rate in his report after learning of Hubbard's criticisms, but stood by his DCF reliant on that rate, even after Hubbard pointed out the inconsistency.

Shaked's original, unadjusted investment rate is a significant driver of his DCF model. Hubbard pointed to this aspect of Shaked's model to explain the wild swings in value when substituting different perpetuity growth rate ("PGR") inputs. Under Shaked's initial model, inputting the different growth rates from banker-supplied DCFs creates outputs that are $1.3 billion apart.[656] This sensitivity to PGR arises because Shaked initially assumed such a low investment rate while predicting outsized growth.[657] Because "the perpetuity growth rate and the investment rate are linked," changing the PGR in Shaked's original model would cause "a very large swing in his DCF value."[658] Shaked described his model's sensitivity to PGR based on his low investment rate as a "built-in problem."[659] Given the significant impact of Shaked's initial investment rate on his DCF, his concession on that input and failure to adjust the model introduces fatal unreliability.

---

[655] *See* Shaked Tr. 1699:14–1742:7.

[656] *See id.* 486:5–18.

[657] *See* Hubbard Tr. 1536:3–21.

[658] *Id.* 1572:19–1574:6.

[659] Shaked Tr. 311:11–312:8.

Above, I determined that the market guides my analysis of this transaction. The Supreme Court has "cautioned against using the DCF methodology when market-based indicators are available."[660] Shaked's shift in his investment rate, the fact that he did not adjust his DCF to accommodate that shift, and the significance of his original investment rate to the output of his DCF render his model unreliable. Petitioners have failed to carry their burden to establish that Shaked's DCF model is a sufficiently reliable indicator, particularly in the shadow of a reliable market-based deal price. I do not attribute any weight to this metric.[661]

### 2. There is not a suitable peer group for a reliable comparative companies analysis.

"[B]efore a comparable companies multiples analysis can be undertaken with any measure of reliability, it is necessary to establish a suitable peer group through appropriate empirical analysis."[662] "If, and only if, a proper peer set can be selected, the next step in the comparable companies analysis is to select an appropriate multiple and then determine where on the distribution of peers the target company falls."[663] Where the experts' identified companies are "too divergent from [the

---

[660] *See Dell*, 177 A.3d at 37–38; *DFC*, 172 A.3d at 369–370, 369 n.118.

[661] *See Solera*, 2018 WL 3625644, at *29 (citing *Union Ill.*, 847 A.2d at 359); *id.* at *32.

[662] *Jarden*, 2019 WL 3244085, at *32.

[663] *Id.* at *33.

company] in terms of size, public status, and products, to form meaningful analogs for valuation purposes,"[664] this Court will disregard this valuation metric.[665]

The parties dispute the relevant peer group and argue that neither expert tested the reasonableness of the comparable companies selected. Hubbard selected comparable companies by reviewing equity analysts' reports in the year before the merger date and selecting the firms mentioned by three or more analysts at least once.[666] As a result, Hubbard included companies that operate outside the fast casual segment, including full-service restaurants like Brinker International, Darden Restaurants, Texas Roadhouse, and The Cheesecake Factory.[667] Hubbard found this analysis produced fair values ranging from $218.58 to $310.99[668]; he did not afford any weight to his comparable companies analysis, but viewed it as corroborative of deal price.[669] Petitioners question Hubbard's peer group as it includes much smaller

---

[664] *Hoyd v. Trussway Hldgs., LLC*, 2019 WL 994048, at *5 (Del. Ch. Feb. 28, 2019).

[665] *See Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *5 (Del. Ch. July 8, 2013) ("[W]hen the 'comparables' involve companies that offer different products or services, are at a different stage in their growth cycle, or have vastly different multiples, a comparable companies or comparable transactions analysis is inappropriate.").

[666] JX0982 at 115.

[667] Hubbard Dep. 360:5–361:23.

[668] JX0982 at 12–13, 120–21.

[669] *Id.* at 123.

companies, including sectors other than fast casual, and does not widely overlap with the comparable companies the bankers identified.

Meanwhile, Respondent highlights that weakness in Shaked's metric. Shaked used a peer group identified by at least 75% of bankers involved.[670] These results exclude all of the fast casual companies the bankers contemporaneously identified, except for Chipotle.[671] It also included and excluded similarly situated companies. For example, Shaked included McDonald's and Burger King, but excluded Wendy's; he included Domino's, but excluded Papa John's.[672] Shaked found this approach resulted in fair values falling between $377.00 and $382.00 per share; he weighed this valuation at 30%.[673]

Where an expert defers to a peer set without conducting a "meaningful, independent assessment of comparability" between the seller's business and the business of its peer companies it "is not useful and, frankly, not credible."[674] Neither expert presents a reliable empirical analysis to show a suitable peer group; both sets have material weaknesses. For that reason, I do not find comparable companies as a fair measure of value. Instead, I view both parties' comparable companies analyses

---

[670] Shaked Tr. 439:23–440:18.

[671] *Compare* JX0983 at 150–51, *with* JX0554 at 44, *and* JX0589 at 39, *and* JX0826 at 37.

[672] *See* Shaked Tr. 441:9–14, 439:16–22.

[673] JX0983 at 59–61.

[674] *Jarden*, 2019 WL 3244085, at *34.

as an attempt to corroborate their preferred valuation. I decline to afford them any weight.

### 3. There are insufficient comparable precedent transactions to generate a reliable valuation metric.

Both parties' experts performed a precedent transaction analysis.[675] Hubbard selected precedent transactions by reviewing eleven transactions that Morgan Stanley included in its April 4, 2017 presentation to the board.[676] He "calculated valuations that are corroborative using multiples of EV/EBITDA based on . . . precedent transactions" that led to a price per share range of $143.58 to $236.22.[677] Hubbard used this data point as corroborative and gave it no weight[678] because a precedent transaction analysis is "model-based" while "the market evidence is the real world."[679]

Shaked conducted a precedent transaction analysis by using data from the FactSet database filtered by acquisitions of restaurant companies in the United States or Canada with an enterprise value over $1 billion.[680] He then compared Panera's

---

[675] *See* JX0982 at 121–22; JX1023; JX0983 at 59–60.

[676] JX0982 at 121.

[677] *See id.* at 123.

[678] *See id.*

[679] Hubbard Tr. 1481:13–23.

[680] JX0983 at 59.

forecasted revenue growth to the upper quartile EBITDA multiples of three comparative transactions and conducted an analysis that led to a price per share range of $338.00 to $361.00 with a midpoint of $350.00 per share.[681] Even though Shaked explained at trial that he "was not really very thrilled with getting only three transactions[,]"[682] he still afforded it 10% weight.

The accuracy of these analyses depends, as with a comparable companies analysis, on the closeness of the comparable transaction. As Morgan Stanley recognized, there was not a "particular transaction that should serve as a direct comparable."[683] I find that neither sample size is reliable enough to afford it weight.

### F. Respondent Is Not Entitled To A Refund Of Its Prepayment.

I turn now to the relief sought. The Company prepaid Dissenting Stockholders the full deal price, or $315.00 per share. Petitioners have obtained more than fair value, which I have found to be $303.44. The Company seeks a refund in the amount of the deducted synergies, or the difference between fair value and prepayment, plus interest on that amount. Petitioners and Respondent did not agree to a clawback provision in the event Respondent overpaid. Respondent cites no support for its request. Like others who have thought about this issue, including

---

[681] *Id.* at 59–60.

[682] Shaked Tr. 255:4–17; *see also id.* 180:24–181:12.

[683] Kwak Tr. 1210:8–1211:6.

125

counsel's firm, I find the request for a refund has no present basis in Delaware's appraisal statute.[684]

Under Section 262(h), a surviving corporation seeking to lessen the significant amount of interest that can otherwise accrue in an appraisal action can prepay petitioning stockholders "an amount in cash."[685]  As the General Assembly explained, "[t]here is no requirement or inference that the amount so paid by the surviving corporation is equal to, greater than, or less than the fair value of the shares to be appraised."[686]  Upon prepayment, interest accrues only upon the sum of the difference between the amount prepaid and the judicially determined fair value, and any interest accrued to date unless paid at that time.[687]  Section 262 does not

---

[684] *See generally* Charles K. Korsmo & Minor Myers, *Interest in Appraisal*, 42 J. Corp. L. 109 (2016); R. Garrett Rice, *Give Me Back My Money:  A Proposed Amendment to Delaware's Prepayment System in Statutory Appraisal Cases*, 73 Bus. Law 1051 (2018); Abigail Pickering Bomba et al., *Proposed Appraisal Statute Amendments Would Permit Companies To Reduce Their Interest Cost—Likely To Discourage "Weaker" Appraisal Claims And Make Settlement Of "Stronger Claims" Harder*, Fried Frank M&A Briefing (Mar. 23, 2015), https://www.friedfrank.com/siteFiles/Publications/FINAL%20-%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%20-%20Proposed%20Appraisal%20Statute%20Amendments.pdf; Arthur R. Bookout et al., *Delaware Appraisal Actions: When Does It Make Sense to Prepay?*, Skadden, Arps, Slate, Meagher & Flom LLP (May 29, 2018), https://www.skadden.com/insights/publications/2018/05/insights-the-delaware-edition/delaware-appraisal-actions.

[685] 8 *Del. C.* § 262(h).

[686] Del. H.B. 371, 148th Gen. Assem., 80 Del. Laws, ch. 265, §§ 8–11 (2016).

[687] 8 *Del. C.* § 262(h).

explicitly contemplate any refund. Accordingly, appraisal litigants sometimes stipulate to a clawback provision in their prepayment agreement.[688]

"Under Delaware law, the appraisal remedy is entirely a creature of statute."[689] "The goal of statutory construction is to determine and give effect to legislative intent."[690] "The courts may not engraft upon a statute language which has been clearly excluded therefrom by the Legislature."[691] "[S]uch action would place the court in a position of making law."[692] Nor may this Court "assume that the omission was the result of an oversight on the part of the General Assembly."[693] Where, as with Section 262, "a statute is silent on a particular matter, the otherwise detailed nature of the statute in other respects can be significant."[694] "[I]n drafting Section

---

[688] *E.g.*, *Artic Invs. LLC v. Medivation, Inc.*, C.A. No. 2017-0009-JRS, D.I. 20 at 5 (Del. Ch. Mar. 6, 2016) (stipulating for clawback rights if the prepayment amount were to exceed the Court's fair value determination of the appraisal shares along with any accrued interest); *see* Rice, *supra* note 684, at 1082 (recognizing that petitioners sometimes stipulate to clawbacks).

[689] *Ala. By-Prods. Corp. v. Cede & Co. ex rel. Shearson Lehman Bros.*, 657 A.2d 254, 258 (Del. 1995) (citation and internal quotations omitted).

[690] *One-Pie Invs., LLC v. Jackson*, 43 A.3d 911, 914 (Del. 2012) (quoting *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 932 (Del. 2007)).

[691] *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982).

[692] *Goldstein v. Mun. Court for City of Wilm.*, 1991 WL 53830, at *5 (Del. Super. Jan. 7, 1991) (citing *State v. Rose,* 132 A. 864, 867 (Del. Super. 1926)).

[693] *Giuricich*, 449 A.2d at 238.

[694] *Terex Corp. v. S. Track & Pump, Inc.*, 117 A.3d 537, 544 (Del. 2015), *as revised* (June 16, 2015).

262(h), the General Assembly made a determination as to the proper balance of the competing interests of appraisal petitioners, who have been cashed out of their preferred investment and denied the ability to invest the merger consideration in the market pending outcome of the case, and respondents, against whom too large an interest award may operate as a penalty."[695]

Here, the only permissible conclusion is fortunately a logical one: the General Assembly intended to omit a refund mechanism. In 2016, the General Assembly enacted an optional and scalable prepayment scheme without mention of a refund. It did so in the shadow of the Model Business Corporation Act (the "Model Act"), adopted by the majority of other states, which is a mandatory and fixed prepayment scheme: it mandates prepayment of what the corporation believes is fair value to stockholders who purchased their stock before the merger was announced, and permits it for stock acquired after the merger announcement.[696] Other amendments to Section 262 have tracked the Model Act, evidencing a legislative awareness of its content.[697] The Model Act is silent on the effects of overpayment, like Section 262,

---

[695] *Huff Fund Inv. P'ship v. CKx, Inc.*, 2014 WL 545958, at *3 (Del. Ch. Feb. 12, 2014).

[696] Model Bus. Corp. Act § 13.24(a) (2016).

[697] *Compare* Del. H.B. 160, 144th Gen. Assem., 76 Del. Laws, ch. 145 §§ 13, 16 (2007), *and* 8 *Del. C.* § 262(h), *with* Model Bus. Corp. Act § 13.01 (adopting the legal rate as the applicable interest rate for dissenting stockholders).

and has been interpreted to allow petitioning stockholders to keep any overpayment.[698]

Commentators have also interpreted Section 262's silence as an indication that overpayment is not recoverable.[699] This Court has not yet resolved the issue.[700] I conclude Section 262 does not explicitly provide for a refund, and that therefore I cannot order one. I am not the first to conclude that the Court must stay within the bounds of Section 262's plain language. In 1948, the Delaware Supreme Court concluded that because the operative version of Section 262 did not provide for interest, the judiciary could not award it.[701] More recently, before the prepayment provision was enacted, Vice Chancellor Glasscock found he was unable to order

---

[698] *See* Model Bus. Corp. Act § 13.30(e); *see also* Rice, *supra* note 684, at 184–86; Mary Siegel, *An Appraisal of the Model Business Corporation Act's Appraisal Rights Provisions*, 74 Law & Contemp. Probs. 231, 236 (2011) ("[I]f the corporation's estimate of fair value is greater than the amount ultimately determined by the court, the corporation will have paid this greater amount to the shareholder without any statutory right to require the shareholder to return the difference between the court's determination of fair value and the corporation's estimate of fair value." (footnote omitted)).

[699] *See* Korsmo & Meyers, *supra* note 864, at 125; Bookout et al., *supra* note 864.

[700] In *Artic Investments LLC v. Medication, Inc.*, the company argued under an unjust enrichment theory that the Court should find the corporation entitled to a refund for overpayment after trial. *See* C.A. No. 2017-0009-JRS, D.I. 15 at 24 (Del. Ch. Mar. 28, 2017). The Court did not resolve this issue, or grant the party's proposed stipulation for a clawback provision, before the parties stipulated to dismissal. *See id.* D.I. 23 (Del. Ch. Mar. 6, 2018).

[701] *Meade v. Pac. Gamble Robinson Co.*, 58 A.2d 415, 417–18 (Del. 1948).

prepayment.[702]  After those exercises in judicial restraint, amendments in the statute soon followed.[703]  I will not encroach on the General Assembly's prerogative.[704]

## III.  CONCLUSION

For the reasons discussed above, I find the fair value of the Company's common stock at time of the merger was $303.44, calculated as deal price minus synergies.  Respondent chose to prepay the $315.00 deal price to the Dissenting Stockholders.  Because Respondent is not entitled to a refund of the difference between $315.00 and $303.44, Petitioners have received more than fair value.  The parties shall submit a stipulated implementing order.

---

[702] *See Huff*, 2014 WL 545958 at *3.

[703] *See* 47 Del. Laws ch. 136, § 7 (1949) (affording the Court the power to award interest); Del. H.B. 371, 148th Gen. Assem., 80 Del. Laws, ch. 265, §§ 8–11 (2016) (creating the possibility of prepayment).

[704] "[T]he expression of dictum is ordinarily to be avoided."  *State ex rel. Smith v. Carey*, 112 A.2d 26, 28 (Del. 1955).  Accordingly, I note only that refraining from awarding a refund here does not offend my sensibilities.  A refund is not available under the Model Act, which tethers the mandatory prepayment amount to the corporation's position on fair value, and therefore gives the prepayment amount significance in the litigation context.  Under the DGCL, prepayment is optional, and a corporation can pay any amount it chooses without making a commitment to fair value.  Prepayment under the DGCL is a business decision, made with knowledge of the company's sale process that is superior to the stockholder's, and with counsel's prediction of how long the litigation may take and how much interest may accrue.  In my view, expressed in dictum, the case for a refund under the DGCL is less compelling than under the Model Act, which does not provide for one.